Filing # 238232175 E-Filed 12/22/2025 01:08:52 PM
Filing # 238213735 E-Filed 12/22/2025 11:00:24 AM

*12/29/2025*
*12-15₁₁*
*GDV*

## IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT
## IN AND FOR GULF COUNTY, FLORIDA

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

   *Plaintiff,*

v.

INSTITUTIONAL SHAREHOLDER
SERVICES INC., GLASS, LEWIS & CO.
LLC,

   *Defendants.*

CIVIL DIVISION

Case No.: 2025 CA 000068 CAAX MX

> **EXHIBIT**
> **1**

### SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on defendant:

> **Institutional Shareholder Services, Inc.**
> **By Serving Its Registered Agent,**
> **Corporation Service Company**
> **251 Little Falls Dr.**
> **Wilmington, DE 1908**

Each defendant is required to serve written defense to the complaint or petition on **Timothy Fraser, plaintiff's attorney, whose name and address is Timothy Fraser, Special Counsel, Office of the Attorney General, State of Florida, Department of Legal Affairs, PL-01 The Capitol, Tallahassee, Florida 32399-1050,** within 20 days[1] after service of the summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff/Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED on   12/22/2025

2025 DEC 21 PM 11:17

FILED FOR RECORD
REBECCA L. NORRIS
CLERK OF CIRCUIT COURT
GULF COUNTY, FLORIDA

REBECCA L. NORRIS
As Clerk of the Court
By:

As Deputy Clerk

---

[1] Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to be inserted as to it is 40 days. When suit is brought pursuant to 768.28, Florida Statutes, the time to be inserted is 30 days.

Filing # 236237226 E-Filed 11/20/2025 12:11:00 PM

**IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT
IN AND FOR GULF COUNTY, FLORIDA**

| | |
|---|---|
| OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS, | CIVIL DIVISION |
| *Plaintiff,* | Case No. _____ |
| v. | PUBLIC REDACTED |
| INSTITUTIONAL SHAREHOLDER SERVICES INC., GLASS, LEWIS & CO. LLC, | |
| *Defendants.* | |

## COMPLAINT

Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs ("Attorney General" or "the State"), by and through its undersigned attorneys, hereby sues Defendants, Institutional Shareholder Services, Inc. ("ISS") and Glass, Lewis & Co. LLC ("Glass Lewis"), together ("Defendants"), and alleges as follows:

## INTRODUCTION

1.    Behind the world of publicly traded companies and their shareholders, proxy advisor firms like ISS and Glass Lewis operate in the shadows—purporting to advise institutional investors like mutual funds and hedge funds on how the individual shareholders they represent should vote their shares to drive the future of American companies.

2.    Defendants dominate this industry—constituting up to 97% of the market for proxy voting advice. Together, these two firms have an astronomical impact on the American economy and corporate culture. They exert enormous influence over the financial standing of countless Floridians, including vulnerable senior citizens.

1

3.     Defendants have used this enormous influence to push their own dogmatic agenda, one that seeks to require publicly traded companies to strictly adhere to highly controversial—and, in some cases, illegal—policies. Quotas for outright racial balancing, gender ideology that promotes genders beyond male and female, and an insistence that concerns about global climate change should influence *every* company's decision-making are Defendants' basic requirements.

4.     It is apparent from the evidence that Defendants ISS and Glass Lewis entered into a per se illegal agreement by agreeing to enforce their controversial ideological mandates by way of threat—recommending votes against corporate board members who are not the right gender or do not fall in line and affirmatively voice support for Defendants' ideological agenda.

5.     To make matters worse, ISS and Glass Lewis deceive Floridian consumers in several critical ways. They assure consumers that the goal of their recommendations is to maximize shareholder value, while their recommendations are infused with their own political goals. They claim that their methods are objective and evidence-based, ███████████████████ ███████████████████████████████████████. They claim that their advice complies with state and federal regulatory frameworks, but that conclusion is questionable at best. Defendants likewise omit material information about these claims that consumers have a need and a right to know. These repeated statements are either outright false or at the very least likely to mislead a reasonable consumer under the circumstances. And Defendants' deceptive practices are unfair, with no countervailing benefit to Florida's consumers.

6.     Defendants also have agreed to move in lockstep, preventing competition and ensuring that neither will face competitive pressure despite offering a low-quality product that ultimately harms clients. Both Defendants have voluntarily joined associations that exist to promote the use of certain controversial ESG criteria when making recommendations. Defendants

2

have also coordinated *directly,* ████████████████████████████████████

████████. And they have homogenized their product: a highly ideological, virtually identical

framework of voting recommendations ██████████████████████████████████████

████████████████████████████████████████.

7.      The Attorney General is charged with enforcing the Florida Antitrust Act and the

Florida Deceptive and Unfair Trade Practices Act. Having determined that the public interest

requires an enforcement action against these firms to protect Florida consumers—including

vulnerable senior citizens—the Attorney General brings this suit to enjoin further violations and

to ensure Defendants are penalized for their wrongful conduct.

## JURISDICTION AND VENUE

8.      This is an enforcement action pursuant to the Attorney General's power and duty to

enforce the Florida Antitrust Act, Chapter, 542, Florida Statutes ("Antitrust Act"), and the Florida

Deceptive and Unfair Trade Practices Act, Chapter 501 Part II, Florida Statutes ("FDUTPA").

9.      The Attorney General seeks relief pursuant to these statutes in an amount greater

than Fifty Thousand Dollars ($50,000), exclusive of fees and costs.

10.     The Attorney General seeks equitable relief, declaratory relief, civil penalties,

injunctive relief, attorneys' fees and costs, actual damages on behalf of injured consumers, and any

other relief against the Defendants pursuant to Florida law both on behalf of the Attorney General

and the Florida consumers the Attorney General is charged to protect.

11.     This court has subject matter jurisdiction pursuant to the provisions of Chapter 542

and Chapter 501, Part II, Florida Statutes.

12.    Venue is proper in the Fourteenth Judicial Circuit because Defendants operate in more than one judicial circuit in the State of Florida, including Gulf County and the Fourteenth Judicial Circuit.

13.    This Court has personal jurisdiction over all Defendants in this action. This Court has personal jurisdiction over Defendants under Florida's long-arm statute, § 48.193(1)(a), Fla. Stat., because Defendants maintain substantial contacts in Florida.

14.    Defendants have availed themselves of the benefits of transacting business in Florida.

15.    To name just a couple of examples, ███████████████████████████████ ███████████████████████████████████████. And ISS clients include GQG Partners,[3] also headquartered in Florida, and ███████████████████████ ████

16.    Both ISS and Glass Lewis provide their commercial services to the Florida State Board of Administration (SBA), which manages the Florida Retirement System. The Florida Retirement System covers the majority of public employees in the state of Florida.

17.    Defendants operate in Florida on a massive scale. In Fiscal Year 2024, for example, the Florida Retirement System had 659,333 active members and provided retirement income benefits to 459,428 retirees. Including Deferred Retirement Option Program (DROP) participants (29,017) and vested terminated members (117,142), the total number of retirement participants was approximately 1.26 million Floridians.

---

[1] ███████████████████████████████████████████████████████████████
[2] *Id.*
[3] *Environmental, Social & Governance (ESG) and Stewardship Policy*, GQG PARTNERS (Jan. 2025), https://perma.cc/NN8N-EZBD.
[4] ███████████████████████████████████████████████████████████████

18.    Defendants' services to the Florida Retirement System impacts an astronomical amount of retirement money in Florida. As of September 30, 2025, the Pension Plan held $218.6 billion in total assets, while the Investment Plan held $21.6 billion, for a combined total of approximately $240.3 billion.

19.    It is well established that "[p]roxy advisory actions—recommendations to investors, retirement funds, and large asset managers on how to vote their shares, and their clients' shares, in public companies—directly affect the financial well-being of more than 100 million Americans."[5] Millions of these Americans are Floridians, including vulnerable retirees who depend on responsible management of their retirement funds.

20.    In sum, Defendants conduct extensive business in Florida and at least hundreds of thousands of Florida employees' retirement plans, plus a dollar amount well into the billions, are directly impacted by Defendants' offering of services in the State.

21.    The conduct described in this Complaint and the harm caused by Defendants arise from Defendants' activities directed to Florida and its residents.

## PARTIES

22.    The Attorney General is an enforcing authority of Chapter 542 and Chapter 501, Part II, Florida Statutes, and is authorized to bring this action for equitable relief, declaratory relief, civil penalties, injunctive relief, attorney's fees and costs, and other relief pursuant to these chapters of state law.

23.    The Attorney General has conducted an examination of the matters alleged and has determined that this enforcement action against Defendants serves the public interest.

---

[5] Benjamin Zycher, *As Firms Back Away from ESG, Congress Must Reform Proxy Voting*, THE HILL (Oct. 29, 2025), https://perma.cc/84Y7-RCC4.

5

24. Defendant ISS is a proxy advisor firm that operates globally, including in Florida. ISS is majority owned by Deutsche Börse Group.

25. Defendant Glass Lewis is a proxy advisor firm that operates globally, including in Florida. Glass Lewis is owned by Peloton Capital Management and Stephen Smith, a financial services entrepreneur.

## TRADE AND COMMERCE

26. The Proxy Advisor Companies have engaged in trade or commerce as defined in Sections 542.17(4) and 501.203(8), Florida Statutes.

27. Under FDUTPA, "[t]rade or commerce" means the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated," and "shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity." § 501.203(8), FLA. STAT.

28. Under the Antitrust Act, "[t]rade or commerce" means "any economic activity of any type whatsoever involving any commodity or service whatsoever." *Id.* § 542.17(4).

29. Both ISS and Glass Lewis sell a service by offering and providing—via sale and for profit—their service of proxy advice to paying clients.

30. The Proxy Advisor Companies' paid services to clients qualify as economic activity involving a service under the Florida Antitrust Act and the offering or sale of a service under FDUTPA.

6

## FACTUAL ALLEGATIONS

### I.    ISS and Glass Lewis Dominate the Proxy-Advising Market.

31.    For most publicly traded companies in the United States, shareholders receive voting rights with their purchase of shares.[6] Shareholder voting rights are typically allocated on a "one share, one vote" basis, and enable shareholders to voice their opinions on a wide array of business decisions that influence the value of their shares.

32.    Shareholder votes are binding on many important matters.[7] In addition to electing board members, which in turn influences virtually every major decision a company makes, many decisions, including granting employees equity in the firm and mergers or acquisitions of the firm, require *direct* approval by voting shareholders.[8]

33.    Shareholders hold a vested interest in the financial future of the company in which they own shares and face a strong incentive to support votes that align with their interests. Given the modern norm of diversified portfolios and institutional investors like mutual funds, index funds, hedge funds, and pension funds, however, a single fund may correspond to hundreds of thousands of shareholder votes each year.[9] With up to hundreds of thousands of votes to consider, tracking the happenings of each company to make informed votes becomes practically difficult for many institutional investors.[10]

34.    For this reason, proxy advising firms offer consulting services to clients like institutional investors—who in turn represent ordinary shareholders with money invested in the

---

[6] David F. Larcker et al., *The Big Thumb on the Scale: An Overview of the Proxy Advisory Industry*, HARV. L. SCH. F. CORP. GOVERNANCE (June 14, 2018), https://perma.cc/ND97-85GA.
[7] *Id.*
[8] *Id.*
[9] James K. Glassman & Hester Peirce, *How Proxy Advisory Services Became So Powerful*, MERCATUS CTR. (June 18, 2014), https://perma.cc/82YK-GVDR.
[10] *Id.*

institutional fund—with the promise of providing detailed information about upcoming votes and making recommendations on how clients should vote in their best interest.[11]

35.    This market for proxy voting advice is dominated almost entirely by two firms: Glass, Lewis & Co. (Glass Lewis) and Institutional Shareholder Services (ISS).[12]

36.    These two firms alone control *97 percent* of the proxy advice market.[13]

37.    "For years, proxy advisory services have been provided by a duopoly comprising Glass Lewis and Institutional Shareholder Services, with a combined share of 97 percent of the market."[14]

38.    These market-dominant companies operate at a massive financial scale. Glass Lewis alone boasts of advising shareholders that oversee *$40 trillion* in assets.[15]

39.    Glass Lewis notes that "Glass Lewis clients . . . include the majority of the world's largest public pension funds, asset managers and mutual funds."[16]

40.    ISS does not disclose its equivalent dollar amount but describes advising 4200 clients—including "the world's leading institutional investors."[17]

41.    Because institutional investors hold 70 percent of all public shares in the United States, the voting recommendations of these two proxy advisor companies have a massive impact on the economy.[18]

---

[11] Larcker, *supra*, n.6.

[12] *Id.*

[13] Glassman & Peirce, *supra*, n.9.

[14] Zycher, *supra*, n.5.

[15] *Who We Are*, GLASS LEWIS, https://perma.cc/HBT4-XFP8.

[16] Katherine Rabin, *Statement of Record for SEC Roundtable on the Proxy Process*, HARV. L. SCH. F. CORP. GOVERNANCE (Nov. 21, 2018), https://perma.cc/4A2J-MH8T.

[17] *About ISS*, ISS, https://perma.cc/EX4L-4S4J.

[18] Larcker, *supra*, n.6.

II.     **ISS and Glass Lewis Impose Their Radical Ideological Agenda Into Their Services.**

42.     Glass Lewis and ISS bring to bear their joint ideological agenda onto the companies for which they provide proxy voting advice by threatening negative voting recommendations if companies do not affirmatively support their agenda. As cataloged below, they insist on ideological compliance with—among other controversial positions—racial quotas, a notion of ███████ ████████ that accepts genders beyond male and female, and a view that *every* company must actively fight ███████████████████

43.     The Defendants tout their requirements for what has been dubbed "ESG"—or environmental, social, and governance issues.

44.     "The proxy advisors make recommendations that do not affect their own financial interests, allowing them to indulge their political preferences with little concern for the fiduciary interests of retirees and shareholders."[19]

45.     "The result has been a steady stream of endorsements by these two firms of proxy proposals promoting 'environmental, social, and governance' objectives, the central examples of which are climate-related mandates, fossil fuel divestments, racial and gender quotas for corporate boards, and other such blatant political initiatives often inconsistent with the maximization of shareholder value."[20]

46.     Reliance on so-called ESG is highly controversial and, in many cases, illegal. Indeed, a *majority* of States have now passed legislation restricting reliance on ESG factors.[21] An

---

[19] Zycher *supra*, n.5.
[20] *Id.*
[21] *Navigating State Regulation of ESG*, ROPES & GRAY, https://perma.cc/N35Y-6LMQ.

even wider majority of States either ban ESG or promote divestment from industries that promote ESG.[22] Florida law restricting reliance on ESG is especially robust.

47.    Glass Lewis admits that "ESG themes have long been covered in Glass Lewis research."[23] And it declares: "we have been collecting information concerning companies' ESG risks and opportunities since our inception as an organization."[24]

48.    ISS similarly declares that every "company's governance, social, and environmental practices should meet or exceed the standards of its market regulations and general practices . . . . Issuers and investors should recognize constructive engagement as both a right and responsibility."[25]

49.    Glass Lewis and ISS both enforce a particularly extreme and controversial version of ESG.

50.    In the course of its ESG agenda, Glass Lewis seeks to impose and enforce racial quotas and sexuality quotas on all corporate boards subject to its review. Glass Lewis "will generally recommend against the chair of the nominating committee of a board with fewer than one director from an underrepresented community on the board at companies within the Russell 1000 index."[26]

51.    Glass Lewis is explicit that these quota requirements are based purely on race and sexuality—not board member experience, upbringing, or any other more holistic measure. Glass Lewis is clear: "We define 'underrepresented community director' as an individual who self-

---

[22] *Id.*

[23] Press Release, Glass Lewis, Glass Lewis Launches ESG Scores and Data to Give Investors Insights Needed for Informed Voting and Engagement Decisions (Feb. 7, 2022), https://perma.cc/NR5P-X4S7.

[24] Press Release, Glass Lewis, Glass Lewis Launches ESG Data Feed Providing Investors Timely Access to Key ESG Data Points (June 15, 2022), https://perma.cc/U5XS-MCFG.

[25] *ISS Global Voting Principles*, ISS, https://perma.cc/W86X-P7DY.

[26] *2025 Benchmark Policy Guidelines* at 41, GLASS LEWIS, https://perma.cc/9JFW-HKEM.

identifies as Black, African American, North African, Middle Eastern, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaskan Native, or who self-identifies as a member of the LGBTQIA+ community,"[27] which stands for Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual, and other sexual-minority community.

52.    Glass Lewis creates "ratings" for whether a company has sufficiently complied with Glass Lewis's racial balancing goals.[28]

53.    In its Benchmark Guidelines, which apply presumptively to all clients, Glass Lewis also lays out a policy of enforcing strict quotas based on its own understanding of "gender diversity." In particular, Glass Lewis flags any companies whose "board . . . is not at least 30 percent gender diverse."[29] Glass Lewis defines "gender diverse" as including a specific number of "[w]omen and directors that identify with a gender other than male or female."[30] ████████

████████████████████████████████████████████████████████████

████████████████████████████████████

54.    Glass Lewis also factors its conception of environmental activism into its Benchmark Policy recommendations. "Glass Lewis will generally recommend voting against the governance committee chair of a company in the Russell 1000 index that fails to provide explicit disclosure concerning the board's role in overseeing [climate change] issues."[32]

55.    Glass Lewis actively enforces its climate change ideology. "Glass Lewis carefully monitors companies' performance with respect to environmental and social issues, including those

---

[27] *Id.*
[28] *Id.* at 42.
[29] *Id.* at 26.
[30] *Id.* at 26 n.27.
[31] ████████████████████████
[32] *2025 Benchmark Policy Guidelines*, *supra*, n.26 at 26–27.

related to climate."[33] "In situations where we believe that a company has not properly managed or mitigated material environmental or social risks . . . Glass Lewis may recommend that shareholders vote against the members of the board who are responsible for oversight of environmental and social risks."[34]

56. ████████████████████████████████████████ ████████████████████████ an association of institutional investors who the United States House Judiciary Committee called a "woke ESG cartel."[35] Climate Action 100+ seeks to use collective action amongst asset managers to, among other things, reduce coal output by 91%.[36] Climate Action 100+ has faced criticism and legal action against its members for alleged violations of the antitrust laws.

57. ████████████████████████████████████████ ████████████████████████████████ Ceres, among other things, has been accused of cajoling "members of the finance industry into pushing harmful, anti-consumer 'net zero' targets at every major public company in the country."[38] █████████████████████ ████████████████████████████████████████████████████

---

[33] *Id.* at 30.

[34] *Id.*

[35] Loes van Dijk, *Climate Action 100+ Under Fire as House Judiciary Cites Antitrust Concerns*, CLIMATE COURT (Aug. 6, 2024), https://perma.cc/ZD2B-JVAZ.

[36] *Investor Expectations for Diversified Mining* at 37, CLIMATE ACTION 100+ (2023), https://perma.cc/6PWY-DJKP.

[37] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

[38] The Ceres Report at 1, CONSUMERS' RSCH (2022), https://perma.cc/53C4-N3GR.



58.

59.

60.    And Glass Lewis's environmentalist agenda—which seeks to require corporate board members to affirmatively support—is extreme. It does not distinguish between companies for which environmental issues may actually pose an impact on shareholder value and those for



39
40
41 *Id.*
42 *Id.*
43
44 *Id.* at 9.

which it does not. "Given the exceptionally broad impacts of a changing climate on companies, the economy, and society in general, [Glass Lewis] view[s] climate risk as a material risk for *all companies*."[45]

61.    Glass Lewis also enforces controversial ESG mandates in its policies specific to public pensions. For example, Glass Lewis states in its 2024 Public Pension Policy Guidelines: "The policy has been updated to provide that, if less than 30% of the board is female, the Public Pension Policy will vote against the entire incumbent male nominating committee; however, where local market standards dictate a *higher* level of expected gender diversity, the Public Pension Policy will follow the local market requirement."[46]

62.    Glass Lewis also applies its extreme global climate change agenda on public pensions. It states: "For companies included in the Climate Action 100+ focus list and those that operate in industries where the Sustainability Accounting Standards Board (SASB) has determined that greenhouse gas ("GHG") emissions represent a financially material risk, the Public Pension Policy will vote against the chair of the board in instances where a company has not adopted a *net zero emissions target* or ambition."[47]

63.    Glass Lewis has imposed and enforced its joint ideological agenda on corporate boards consistently for several years.[48]

---

[45] *2025 Benchmark Policy Guidelines*, *supra*, n. 26 at 30 (emphasis added).
[46] *Public Pension Thematic Voting Policy Guidelines* at 5, GLASS LEWIS (2024), https://perma.cc/9QZ3-VS6L (emphasis added).
[47] *Id.* at 12 (emphasis added).
[48] *2021 Proxy Paper Guidelines: An Overview of the Glass Lewis Approach to Proxy Advice*, GLASS LEWIS (2021), https://perma.cc/C3KV-XFFH;
Press Release, Glass Lewis Launches ESG Data Feed Providing Investors Timely Access to Key ESG Data Points, *supra*, n. 24.

64.    Glass Lewis has enforced its ESG agenda by creating and monitoring an "ESG Profile" and "ESG Data Feed solution," which catalogs Glass Lewis's ESG findings as to individual companies.[49]

65.    Glass Lewis has also joined several foreign agreements that promote the use of ESG and similar ideologies in corporate decision making.[50]

66.    ISS has acted in concert with Glass Lewis to enforce extreme forms of ideological ESG, including gender- and race-based balancing and demands that every company focus on reducing greenhouse gas emissions. In its Proxy Voting Guidelines Benchmark Policy Recommendations, which apply presumptively to all clients, ISS lists the following directives:

      a.    "Generally vote against . . . companies where there are no women on the company's board."[51]

      b.    "For companies in the Russell 3000 or S&P 1500 indices, generally vote against . . . where the board has no apparent racially or ethnically diverse members."[52]

      c.    "For companies that are significant greenhouse gas (GHG) emitters . . . generally vote against . . . in cases where ISS determines that the company is not taking the minimum steps needed to understand, assess, and mitigate risks related to climate change."[53]

---

[49] *Id.*

[50] Glass, Lewis & Co., (@GlassLewis), X (Mar. 13, 2025 at 4:00 pm ET), https://perma.cc/D5R3-AEUQ; Glass, Lewis & Co., (@GlassLewis), X (Sep. 27, 2022 at 10:09 am ET), https://perma.cc/HDC9-GY2V; *How Glass Lewis Helps Investors Meet the UN PRI Principles and Reporting Requirements*, GLASS LEWIS (June 19, 2025), https://perma.cc/LVY3-YCCS.

[51] *United States Proxy Voting Guidelines Benchmark Policy Recommendations* at 12, ISS (Feb. 1, 2024), https://perma.cc/N9TG-B7X9.

[52] *Id.*

[53] *Id.* at 17.

67.    

68.

69.    Just like Glass Lewis, ISS is also a member of foreign organizations that require it to place ideology into its calculous when making recommendations.[56]

70.    ISS has likewise put its ideological agenda into action. 

This outright racial and gender balancing is entirely consistent with ISS's stated approach to board composition, which requires strict racial and gender quotas.

---

54

2.

[56] Financial Reporting Counsel, UK Stewardship Code Signatories, (August 13, 2025), https://perma.cc/KY2F-A3GP.

57

58

59

III.    **ISS and Glass Lewis Deceive Florida Consumers.**

   A.  **ISS and Glass Lewis Deceptively Claim They Increase Shareholder Value.**

71.    Defendants deceive Florida consumers by claiming that they seek to maximize shareholder value rather than promote their own ideological goals.

72.    To illustrate just a few of the countless examples of Defendants' deceptive statements:

73.    Glass Lewis claims that "[t]he purpose of Glass Lewis' proxy research and advice is to facilitate shareholder voting in favor of governance structures that will drive performance, create shareholder value and maintain a proper tone at the top."[60]

74.    ISS claims that its "Benchmark Voting Policy," which reflects its ideological agenda, is "designed to promote long-term shareholder value, good governance and risk mitigation . . ."[61]

75.    ███████████████████████████████████████
███████████████████

76.    ███████████████████████████████████████
███████████████████

---

[60] 2025 Benchmark Policy Guidelines, *supra,* n. 26 at 9.
[61] Letters from Kevin Cameron, Exec. Chair, Glass Lewis, & Gary Retelny, President & CEO, ISS, to State Treasurers and Financial Officers (June 29, 2023). https://perma.cc/7VJX-26NA.
[62] ███████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████
[63] ███████████████████████████████ *United States Procedures & Policies (Non-Compensation): Frequently Asked Questions* at 38, ISS (Feb. 25, 2025), https://perma.cc/G89E-ZWD6; *see also Business Practices & Principles,* ISS, https://perma.cc/9WC2-53KM; ████████████████████
███████████ *About ISS, supra,* n.17.

77.    In reality, Defendants' commitments to ideological social justice efforts do the very opposite of what they claim—they objectively *decrease* shareholder value by injecting considerations other than financial performance into the analysis.

78.    Defendants' contrary claims are either outright false, or at least likely to mislead a reasonable Florida consumer. Defendants know—or should know—that the well-documented evidence makes their contrary claims to Florida consumers deceptive.

79.    ESG investing like Defendants' has objectively and consistently underperformed compared to the S&P 500. The S&P 500 tracks the performance of roughly 500 of the largest U.S. companies, serving as a general indicator of the overall market. Thus, Defendants' ESG-tinged advice leaves clients and investors worse off than if they had simply tracked the market generally.

80.    This decrease in shareholder value is *significant*—with estimates putting the discrepancy between ESG investing and simply tracking the overall market at an over 11% decrease in value. "ESG investing has underperformed the S&P 500, with the Kiplinger ESG 20 returning 4.3% over the past year, compared to the index's 15.9% return."[64]

81.    This makes sense. "[A]rtificial constraints on investment options—'divest from fossil fuels!'—cannot improve investment returns to a portfolio over the longer term and are inconsistent with the diversification needed to maximize expected returns."[65]

82.    

---

[64] *ESG Investing Underperforms S&P 500: Why AI Stocks Made the Cut*, AINVEST (Oct. 25, 2025), https://perma.cc/WPM2-JWEE.

[65] Zycher, *supra*, n.5.

[66] ▮▮▮▮▮▮▮▮

[67] *Id.*

83. 

84. ████████████████████████████

████████████████████████ Glass Lewis did not explain how it could be the case that every climate reporting proposal increased every company's value for shareholders.

85.    Glass Lewis also universally supported climate *lobbying* efforts—never explaining how lobbying a company is conducive to increasing value for investors. ████████

86. ████████████████████████

87.    ISS promotes a policy package called SRI, or "socially responsible investing." In its *public* SRI policies, ISS emphasizes that "[s]ocially responsible investors invest for economic gain, as do all investors."[72]

---

68 ████████████████████████████████████████

69 *Id.*
70 █
71 ████████████████████████████████████████

72 *United States SRI Proxy Voting Guidelines: 2025 Policy Recommendations* at 9, ISS (Feb. 25, 2025), https://perma.cc/63V6-27U2.



88. ████████████████████████████████████

████████████████████████████████████████

███████████████████████

89. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

90. ████████████████████████████████████ ISS

never explains—simply dictating: "Vote against shareholder proposals that do not seek to

ultimately advance the goals of the social investment community."[77]

91. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

92. ████████████████████████████████████

████████████████████████████████████████

███████████████████

93.    Even if Defendants somehow prevail in their gamble that commitment to

ideological social justice initiatives of Defendants' choosing will increase shareholder value in the

---

[73] ████████████████████████████████████
████████████████

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *United States SRI Proxy Voting Guidelines, supra,* n.72 at 95.

[78] ████████████████████████████████████

[79] *Id.*

*long*-term, they continue to deceive Florida consumers about the short- and medium-term impacts of focus on these efforts at the expense of traditional metrics of financial growth.

94.    A reasonable Florida consumer and institutional investor would assume that Defendants focus so intently on ESG causes because they have *some* relevance to Defendants' core claim of increasing shareholder value. After all, Defendants directly tie their ideological causes to their claims of increasing shareholder value. In fact, Defendants' social justice efforts are—at best—entirely irrelevant to maximizing shareholder value, if not affirmatively contradictory.

### B. ISS and Glass Lewis Deceptively Boast an Objective, Evidenced Basis for their ESG Agenda.

95.    Defendants deceptively assure consumers and investors that their recommendations are based on rigorous analysis and also assure their customers that there is an objective basis for their commitment to ideological social justice causes over traditional metrics of financial growth. In fact, Defendants' statements are not based on substantial evidence or objective reality. Rather, Defendants' claims are based on experimental and controversial notions about the impact that social justice commitments *may* have on some conception of "reputational value" that is not evidence-based. Often, there is no analysis at all supporting Defendants' recommendations—just ideology.

96.    Tellingly, the vague "reputational" harms Defendants gesture to are associated with a left-wing ideology. Defendants do not put a similar focus on concerns from other perspectives. To name just a few examples, Defendants apparently are silent on the reputational concerns associated with matters such as companies employing illegal immigrants in their workforces or not manufacturing products in the United States. Defendants' one-sided focus demonstrates that

21

Defendants' vague "reputational" worries are simply a thinly veiled, poorly explained political and ideological agenda—not a genuine concern for shareholder value.

97.    Defendants' deceptive statements abound. To highlight just a few examples:

98.    ISS touts its recommendations as based on "high-quality data" and "analytics."[80]

99.    ISS advertises its ESG scoring system as "a data-driven scoring and screening solution designed to measure and identify areas of environmental and social risk."[81]

100.    ████████████████████████████████████████████████

101.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

102.    ISS claims that its voting policies "incorporate a rigorous analysis of ESG topics."[84]

103.    ISS states that it maintains "[r]igorous internal review processes for research and data."[85]

104.    Glass Lewis claims that it provides "expert analysis" and "accurate data" for "voting recommendations for all the companies in our clients' portfolios."[86]

105.    Glass Lewis assures the public that "our role is not to advocate or seek to persuade our clients to . . . vote in any particular way on a ballot item. And we certainly have not made any

---

[80] *Proxy Voting Guidelines Benchmark Policy Recommendations, supra,* n.51 at 87; ████████████████████████████████

████████████████ *see also About ISS, supra,* n.17;█████████████████████████
[81] *Statement in Connection with Planned Methodology Update for Environmental & Social Disclosure QualityScore,* ISS INSIGHTS (Sept. 24, 2025), https://perma.cc/WPJ3-8Y5K.
[82] *Id.*
[83] Letter from Gary Retelny, President & CEO, ISS, to Sean Reyes, Utah Att'y Gen. et al. at 10 (Jan. 31, 2023), https://perma.cc/VEU2-9NGZ.
[84] █████████████████████████████████████████████████████
[85] ██████████████████████████████████████████████████████
[86] Glass, Lewis & Co., (@GlassLewis), X (Apr. 12, 2022 at 12:08 pm ET), https://perma.cc/2Z2A-K2VZ.

'pledge' or 'commitment' as to their votes. Our role is to provide *objective* research and other tools to help our clients vote as they see fit."[87]

106. 

107. Glass Lewis claims that it "provides in-depth research, data, and customized engagement and voting solutions."[89]

108. In reality, Defendants' laser focus on pursuing their own ideological agendas—and their requirements that corporate boards publicly ratify the same ideas— do not have an objective, analytical basis.

109. 

110.

---

[87] Letter from Kevin Cameron, Exec. Chair, Glass Lewis, to Att'ys Gen at 2 (Jan. 31, 2023), https://perma.cc/A92F-4D5U (emphasis added); *2024 Sustainability Report,* GLASS LEWIS, https://perma.cc/7FSH-JP47 (commitment to "objectivity").
[88]

[89] *Investment Stewardship Solutions to Help Pension Funds,* GLASS LEWIS, https://perma.cc/E2PS-UMWR.
[90]
[91]

██████████████████████████████████████

██████████████████████████████████████

███████████

111.    Defendants fail to sufficiently define key terms, like "materiality," and seek to confuse consumers by muddling ill-defined concepts like "diversity" and "sustainability."

112.    Both companies permit their clients and potential clients to select an "ESG" package—implying that other available options do not support ESG.[93] In fact, *all* Defendants' recommendations—including their standard or "Benchmark Policies" cataloged above—include enforced commitments to ESG.

113.    And both companies have failed in particular to provide a sufficient basis in evidence for their insistence on outright racial, gender, and sexuality quotas in corporate board membership. At most, Defendants provide vague support for the notion that "diversity" benefits board membership without justifying their extreme position of outright numerical quotas. And Defendants fail to disclose or reckon with compelling evidence contrary to their position.[94] For example, even studies *favorable* to forced gender quotas acknowledge the reality of negative stock market performance associated with forced quotas.[95] For example, a study that "synthesize[d] the findings from the active literature studying the effects of gender boardroom quota policies"

---

[92] ███████████████████████████████████

[93] *ESG, Thematic Voting Policy*, GLASS LEWIS (2024), https://perma.cc/PL9X-9ASG; *Climate, Thematic Voting Policy Guidelines*, GLASS LEWIS (2024), https://perma.cc/23Q3-ME9V.

[94] *See, e.g.*, Alina Dizik, *Do Quotas for Corporate Boards Help Women Advance?*, CHI. BOOTH REV. (June 15, 2015), https://perma.cc/9QBJ-K2U7 (noting that mandatory gender quotas imposed in other countries have brought "mixed results").

[95] Costanza De Acutis et al., *The Effects of Board Gender Quotas: A Meta-Analysis*, 91 LABOUR ECON. (2024), https://perma.cc/AY59-ZYDD.

concluded that a "strong negative coefficient for outcomes related to stock market performance remains significant."[96]

114.    The fact that prevailing studies have concluded that "stock market returns are most negatively affected by quota policies"[97] is highly material, and flatly contradicts Defendants' claims that they increase shareholder value by engaging in evidenced-based analysis.

## IV.    ISS and Glass Lewis Deceive Consumers By Recommending—and Enforcing—Requirements for Discrimination that are Highly Suspect Legally.

115.    As cataloged above, Defendants recommend that their clients adopt strict racial, gender, and sexuality quotas in board membership and vote against proposals from boards that fail to adhere to Defendants' quotas for racial and gender composition.

116. ███████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████

117. ███████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████   ██████
█████████████████████████████████████████

---

[96] *Id.* at 17, 19.
[97] *Id.* at 20.
[98] ███████████████████████████████
[99] ███████

25



118. ███████████████████████████████████████████

███████████████████████

119.    Glass Lewis likewise adopts quotas, stating it "will generally recommend against the chair of the nominating committee of a board with fewer than one director from an underrepresented community on the board at companies within the Russell 1000 index."[103] Glass Lewis defines " 'underrepresented community director" as an individual who self-identifies as Black, African American, North African, Middle Eastern, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaskan Native, or who self-identifies as a member of the LGBTQIA+ community."[104]

120.    Blatant racial quotas, which necessarily require discriminating on the basis of race, are highly suspect under prevailing law.

121.    Under 42 U.S.C. § 1981(a), for example, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a). This protection extends even to non-state actors, as "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination." *Id.* § 1981(c).

122.    At the very least, outright racial balancing creates significant and unjustifiable legal risks for companies and state agencies that follow Defendants' recommendation to engage in it.

123.    For example, in Florida, any retirement system or plan must consider only

---

[100] *Id.*
[101] *Id.:* ███████████████████████████████████████

[103] *2025 Benchmark Policy Guidelines, supra,* n.26 at 41.
[104] *Id.*

pecuniary factors—and thus not ESG—when making shareholder rights related decisions.[105]

124.    Thus, while it recommends *legally suspect* action, Glass Lewis assures consumers that it *ensures* regulatory compliance. Glass Lewis insists that "Glass Lewis' Proxy Voting Policies offer institutional investors market-specific guidelines for voting on annual general meeting proposals, helping them meet . . . *regulatory requirements*."[106] ███████████████

███████████████████████████████████████████████

## V.    ISS and Glass Lewis Engage in Anticompetitive Conduct.

125.    Defendants have engaged in anticompetitive conduct in violation of Section 542.18 of the Florida Statutes by agreeing with each other to homogenize their services in the proxy advising market in the United States.

126.    Together, Defendants dominate over 90% of the proxy advisor market, with the most recent estimates as high as 97%.[108] Defendants act in lockstep and have agreed to standardize their service.

127.    As of 2021, estimates placed ISS's market control at 48% of the proxy advice market for U.S. mutual funds, with assets totaling $26.8 trillion from 144 fund families.[109] Glass Lewis held 42%, with $23.6 trillion in assets across 94 fund families.[110]

---

[105] *Navigating State Regulation of ESG*, ROPES & GRAY, *supra*, n.21.
[106] *Enhance Decision-Making with Consistent Proxy Voting Policies*, GLASS LEWIS, https://perma.cc/5VYP-HW5R (emphasis added).
[107] ██████████████████████████████████████
[108] Editorial Board, *Cracking the Proxy Advisory Duopoly: Glass Lewis and ISS have a 97% Market Share and Conflicts of Interest*, WALL. ST. J. (July 12, 2023), https://perma.cc/677C-NBPR.
[109] Chong Shu, *The proxy advisory industry: Influencing and being influenced*, 154 J. FIN. ECON. 1, 2 (2024), https://perma.cc/QNH3-AE3H.
[110] *Id.*

128.    Defendants have engaged in per se illegal conduct that had the intended effect of creating a proxy advising market in which Defendants need not compete on the quality of their services.

129.    In at least three critical ways, Defendants have acted in a manner that evinces an agreement to incorporate an ESG agenda into their offerings and therefore not to compete on product quality.

130.    First, despite being competitors in a massively lucrative industry,



131.

132.

133.

134.    Second, Defendants voluntarily joined associations that encourage, if not require, them to act in concert and offer a lower quality product that is infected with considerations unrelated to shareholder value.

135.    ███████████████████████████████████████ the UN PRI Principles and Reporting Requirements.[115] Likewise, both Defendants follow the "UK Stewardship Code," which requires signatories to "systematically integrate stewardship and investment, including material environmental, social and governance issues, and climate change, to fulfil their responsibilities."[116] ███████████████████████████████

██████ ██ ██████████

136.    Third, Defendants do not compete on the quality of their services and have in turn homogenized their products. They do this despite evidence of poor performance and known demand for product differentiation. In particular, Defendants incorporate ESG into all voting recommendations and have acted in concert not to offer non-ESG products.

137.    Defendants' ESG recommendations are borderline identical in the most relevant respects. As cataloged above, both Defendants base their benchmark or presumptive recommendations on the same brand of ESG ideology. In particular, both Defendants advocate for racial, gender, and sexuality quotas on corporate boards and an extreme version of environmentalism, which mandates increased climate reporting and reduction in greenhouse gas emissions for all companies, regardless of financial effect. And both Defendants cloak and market

---

[115] *How Glass Lewis Helps Investors Meet the UN PRI Principles and Reporting Requirements*, GLASS LEWIS (June 19, 2025), https://perma.cc/LVY3-YCCS; PRI Directory, Principles for Responsible Investment (last viewed Nov. 19, 2025) https://www.unpri.org/supporters (listing ISS as a member since 2014).

[116] Glass, Lewis & Co., (@GlassLewis), X (Sep. 27, 2025 at 10:09 am ET), https://perma.cc/HDC9-GY2V (second quoting *The UK Stewardship Code 2020* at 15, ECGI, https://perma.cc/C273-HKVH).

[117] ████████████████████████████████████████████

their ESG ideology in the alleged management of "reputational risk," while considering risk from one extreme angle of the political spectrum.

138.   Defendants have agreed to homogenize their services in this way despite ample evidence that demand exists for non-ESG proxy advice and significant evidence that ESG proxy advice is less effective than advice focused on traditional metrics of shareholder value ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

139.   Defendants' anticompetitive conduct harms the market for proxy advice and hurts both institutional and individual consumers. Because of Defendants' lockstep coordination to offer subpar ESG-tinged proxy advice, consumers have little choice but to accept a service hampered by ESG ideology rather than traditional metrics of financial value.

140.   Defendants also harm the economy more broadly by setting corporate-governance standards according to an artificial and irrational set of policies unmoored from any rigorous evidence. By precluding competition on the quality of proxy advising, Defendants' anticompetitive conduct reduces the quality of advice given to those who vote a majority of the shares in America's companies.

## COUNT I
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, SEC. 501.204, FLA. STAT., DECEPTIVE ACTS AND STATEMENTS.

---

118 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

141.    The State repeats and incorporates by reference each allegation contained in paragraphs 1 through 140 as if fully set forth herein.

142.    Defendants engage in trade or commerce in the State of Florida by selling their service of proxy advice to paying Florida clients, such as ███████████████████████ ████████ *See* § 501.203(8)-(9), FLA. STAT.

143.    A "representation, omission, or practice" is deceptive under the FDUTPA if it "is likely to mislead consumers acting reasonably in the circumstances." *State v. Beach Blvd. Automotive, Inc.*, 139 So. 3d 380, 387 (Fla. 1st DCA 2014); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003). "[U]nlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *State, Off. of Att'y Gen., Dep't of Legal Affs. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004).

144.    Defendants have deceived Florida consumers through their statements, acts, practices, and material omissions. For example, Defendants claim that they seek to maximize long-term shareholder value, but many of their recommendations push policies that are not designed to maximize value at all, such as gender quotas or so-called ESG metrics. Likewise, Defendants claim that their DEI and ESG recommendations are backed by rigorous analysis. ████████████ ██████████████████████████ ideology, not data, was the driving force behind these recommendations. Defendants, put simply, claim to be neutral advisors while attempting to further an ideological agenda.

145.    Defendants' statements, acts, and practices are likely to mislead a reasonable consumer under the circumstances. *See Beach Blvd. Automotive, Inc.*, 139 So.3d at 387. Defendants hold themselves out as neutral experts who consumers can trust to act in their best

31

interest. It is therefore reasonable for consumers to believe that companies with multi-trillion-dollar client portfolios would tell the truth about how to maximize long-term shareholder value.

146.    Defendants also omit information material to consumers, which Defendants have a duty to disclose. For example, Defendants routinely recommend that boards institute quotas along racial lines. Doing so carries significant legal risk. For instance, 42 U.S.C. § 1981 outlaws racial discrimination in private contracting. *See Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 775 (11th Cir. 2024). Despite the prospect of a significant damages award for engaging in blatant racial discrimination, Defendants recommended that shareholders vote against board members based on the racial composition of their boards. Nor did Defendants disclose the material risk of consumer backlash against their political agenda.

147.    Defendants act willfully because they know or should have known that their actions were deceptive. Defendants knew or should have known that that there is no empirical consensus that the percentage of women and so-called non-binary individuals on a company's board did not increase long-term value. And they were also aware or should have been aware of the literature showing that ESG funds underperform the market. ██████████████████████

████████████████████████████████████████ ██

148.    Defendants victimize senior citizens through their actions impacting Florida seniors' retirement accounts and pension funds.

---

119 ██████████████████████

## COUNT II
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, SEC. 501.204, FLA. STAT., UNFAIR ACTS AND PRACTICES.

149.    The State repeats and incorporates by reference the allegations in paragraphs 1 through 140 as if fully set forth herein.

150.    Defendants' unfair practices offend established public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *See PNR, Inc.,* 842 So.2d at 777. A Defendant need not mislead a customer to engage in an unfair practice. *See Webber v. Bactes Imaging Sols., Inc.,* 295 So. 3d 841, 845 (Fla. 2d DCA 2020) ("Because we have already determined that Bactes's conduct constitutes an unfair act or practice under FDUTPA, *see* § 501.204(1), it is unnecessary for us to decide whether that conduct is also deceptive."). For example, a creditor can commit an unfair act by unduly harassing a debtor without deceiving him in any way. *See Schauer v. Gen. Motors Acceptance Corp.,* 819 So.2d 809, 812 (Fla. 4th DCA 2002) (explaining that a plaintiff stated a claim when he "alleged sufficient facts to show [Defendant] violated this Act by willfully harassing him and his family with respect to the collection of its debt.").

151.    Florida follows the FTC's three-part test for unfairness: "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Porsche Cars N. Am., Inc. v. Diamond,* 140 So. 3d 1090, 1098 (Fla. 3d DCA 2014); Federal Trade Commission Act Amendments of 1994, Pub. L. No. 103–312, § 9, 108 Stat. 1691, 1695 (codified as amended at 15 U.S.C. § 45(n) (1994)).

152.    The injury to Florida consumers caused by Defendants qualifies as unfair within FDUTPA. *See Porsche Cars N. Am.,* 140 So. 3d at 1098. It unethical and substantially injures customers when proxy advisors give advice based on ideological considerations instead of neutral

33

advice based on financial analysis. Even if Defendants subjectively thought that clients should vote for liberal policy positions, it was unethical to give that advice while knowing that it was unrelated or harmful to the long-term value of the companies. This fact is all the more true in a hyper-concentrated market, where consumers do not have the ability to shop around for the best advice.

153.    Defendants' unfair acts and practices have impacted millions of Floridians and billions of dollars belonging to them. The Florida Retirement System's pension plan alone has over $240 billion dollars invested and has relied on the advice of Defendants. Given the size of the pension plan and the importance of the votes that Defendants make recommendations on, it is at least "likely" that their faulty advice, even pretending it was not given maliciously, would result in a "substantial injury." *See id.*

154.    This harm is not outweighed by any countervailing benefits to consumers or competition that the Defendants' practices produce. Indeed, there is no benefit to proxy advisors promoting their own political goals over their financial well-being of their clients. The entire reason that proxy advisors are hired in the first place is because they are in a better place to determine how to promote long-term shareholder value.

155.    Likewise, this case does not involve an injury that consumers themselves could have reasonably avoided. It was reasonable for Florida consumers to rely on the promises of the two largest proxy advisors, even though it turned out the advisors were seeking to further ideological policy preferences instead of the pecuniary interests of their customers.

### COUNT III
### VIOLATION OF FLORIDA ANTITRUST ACT SEC. 542.18
### CONSPIRACY IN RESTRAINT OF TRADE

156.    The State repeats and incorporates by reference the allegations in paragraphs 1 through 140 as if fully set forth herein.

34

157.    Defendants operate in a concentrated duopolistic market; that market structure facilitated their collusion.

158.    Defendants engaged in conduct constituting a contract, combination, or conspiracy in restraint of trade within Florida, § 542.18, Florida Statutes. *See also MYD Marine Distrib., Inc. v. Int'l Paint Ltd.*, 76 So. 3d 42, 46 (Fla. 4th DCA 2011) ("[W]e 'look to federal cases to elucidate what is an agreement in restraint of trade and what proof constitutes a conspiracy.'" (*quoting Parts Depot Co. v. Fla. Auto Supply, Inc.*, 669 So. 2d 321, 324 (Fla. 4th DCA 1996))

159.    Defendants entered, communicated, and policed their agreement, contract, combination, or conspiracy through multiple avenues. ██████████████████████

██████████████████████████████████████████ Sharing information about future actions is a classic indicium of a conspiracy to coordinate on those actions. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022). ████████████

████████████████████████████████████████████████

████████████████████████████████████████████

160.    Likewise, Defendants also became signatories to various associations. These associations not only provided Defendants with the opportunity to reach their agreement to standardize their products, but they also essentially committed Defendants to incorporate a common set of ESG features into all of their products, and thereby restricting their competition on product quality and diversity. Joining an organization can constitute joining a conspiracy, even if not all the members join at the same time or are even aware of each other. *See Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939).

35

161.    The result of Defendants' agreement was a homogenized product, i.e. proxy advice. Without this agreement not to compete on product quality one of the two Defendants would have been incentivized to refuse to put politics over profit and reap the reward of more business because of its better advice. The agreement, however, deprived consumers of this option and allowed ISS and Glass Lewis to sell tainted proxy advice without surrendering their market share.

162.    Defendants' coordination unreasonably restrains trade and competition and produces anticompetitive effects in the market. It is black letter law that a conspiracy to sell only a standardized product unreasonably restricts legitimate competition and harms consumers, particularly where, as here, the conspirators agree to offer only a product of inferior quality. *California Dental Ass'n v. FTC.*, 526 U.S. 756, 785-86 (1999); *Paramount Famous Lasky Corp. v. United States,* 282 U.S. 30, 43 (1930); *United States v. First Nat. Pictures, Inc.,* 282 U.S. 44, 54–55 (1930).

163.    Defendants' anticompetitive conduct has a substantial impact on Florida commerce. Because Defendants control around 97% of the market for proxy advice, Floridians were unable to switch to an alternative and suffered a pecuniary injury as a result.

164.    Defendants' anticompetitive conduct is not outweighed by any pro-competitive benefits. Indeed, as a horizontal agreement not to compete on the quality of the proxy advice they give, there is no benefit to the consumer whatsoever.

165.    This is an enforcement action that alleges civil violations of the Florida Antitrust Act, Section 542.18, Florida Statutes. The Attorney General seeks equitable relief, declaratory relief, civil penalties, injunctive relief, attorney's fees and costs, and other relief under Section 542.21, Florida Statutes, for each contract, combination or conspiracy that restrained any part of trade or commerce within Florida in violation of Section 542.18, Florida Statutes.

36

166.    The conduct described above constitutes one or more violations of Section 542.18.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs, respectfully requests that this Court:

1.    Enter judgment in favor of the Attorney General and against Defendants;

2.    Declare that Defendants' actions violate FDUTPA and the Florida Antitrust Act.

3.    Temporarily and permanently enjoin Defendants to prevent future violations of FDUTPA and the Florida Antitrust Act.

4.    Award civil penalties and attorneys' fees pursuant to FDUTPA and the Florida Antitrust Act.

5.    Award actual damages pursuant to FDUTPA and the Florida Antitrust Act.

6.    Award to the State of Florida treble damages for violations of Section 542.18, Florida Statutes;

7.    Order that Defendants pay court costs and all costs associated with distributing and executing on any restitution or judgment made by this Court; and

8.    Grant any other such legal or equitable relief as justice permits.

[Signature block on next page]

Dated: November 20, 2025

Respectfully submitted,

STATE OF FLORIDA
JAMES UTHMEIER
ATTORNEY GENERAL

DAVID DEWHIRST
Chief Deputy Attorney General

David H. Thompson*
Peter A. Patterson*
Harold S. Reeves*
Athanasia O. Livas (FL Bar No. 1060744)
Bradley L. Larson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

.*Applications for admission
*pro hac vice* forthcoming

_/s/ Timothy Fraser_

Lizabeth A. Brady (FLB #457991)
Director, Antitrust Division
Timothy Fraser (FLB # 957321)
Senior Assistant Attorney General
Office of the Attorney General
State of Florida
Department of Legal Affairs
PL-01 The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300

*Attorneys for Office of the Attorney General,
State of Florida, Department of Legal Affairs*

38