**IN THE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

OFFICE OF THE ATTORNEY
GENERAL, STATE OF FLORIDA,
DEPARTMENT OF LEGAL
AFFAIRS,

    *Plaintiff*,

v.

INSTITUTIONAL SHAREHOLDER
SERVICES INC., GLASS, LEWIS &
CO. LLC,

    *Defendants.*

Case No. 5:26-cv-00026-MW-MJF

## SECOND AMENDED COMPLAINT

Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs ("Attorney General" or "the State"), by and through its undersigned attorneys, hereby sues Defendants, Institutional Shareholder Services, Inc. ("ISS") and Glass, Lewis & Co. LLC ("Glass Lewis"), together ("Defendants"), and alleges as follows:

## INTRODUCTION

1. Behind the world of publicly traded companies and their shareholders, proxy advisor firms like ISS and Glass Lewis operate in the shadows—purporting to advise institutional investors like mutual funds and hedge funds on how the

1

individual shareholders they represent should vote their shares to drive the future of American companies.

2.    Defendants dominate this industry—constituting up to 97% of the market for proxy voting advice. Together, these two firms have an astronomical impact on the American economy and corporate culture. They exert enormous influence over the financial standing of countless Floridians, including vulnerable senior citizens.

3.    Defendants have used this enormous influence to push their own dogmatic agenda, one that seeks to require publicly traded companies to strictly adhere to highly controversial—and, in some cases, illegal—policies. Quotas for outright racial balancing, gender ideology that promotes genders beyond male and female, and an insistence that concerns about global climate change should influence *every* company's decision-making are Defendants' basic requirements.

4.    Defendants ISS and Glass Lewis deceive Floridian consumers in several critical ways. They assure consumers that the goal of their recommendations is to maximize shareholder value, while the recommendations they send Floridian consumers are infused with their own political goals. They claim that their methods are objective and evidence-based, while internal documents and communications demonstrate that they sacrifice rigor for ideological commitment. They claim that their advice complies with state and federal regulatory frameworks, but that

conclusion is questionable at best. Defendants likewise omit material information about these claims they send to Floridan consumers that the consumers have a need and a right to know. These repeated statements are either outright false or at the very least likely to mislead a reasonable consumer under the circumstances. And Defendants' deceptive practices are unfair, with no countervailing benefit to Florida's consumers.

5. Defendants also have moved in lockstep, ensuring that neither will face competitive pressure despite offering a low-quality product that ultimately harms clients. Both Defendants have voluntarily joined associations that exist to promote the use of certain controversial ESG criteria when making recommendations. Defendants have thus homogenized their product: a highly ideological, virtually identical framework of voting recommendations despite Defendants' internal discussions revealing that these recommendations may not be in the best interest of clients.

6. The Attorney General is charged with enforcing the Florida Deceptive and Unfair Trade Practices Act. Having determined that the public interest requires an enforcement action against these firms to protect Florida consumers—including vulnerable senior citizens—the Attorney General brings this suit to enjoin further violations and to ensure Defendants are penalized for their wrongful conduct.

**JURISDICTION AND VENUE**

7.      This is an enforcement action pursuant to the Attorney General's power and duty to enforce the Florida Deceptive and Unfair Trade Practices Act, Chapter 501 Part II, Florida Statutes ("FDUTPA").

8.      The Attorney General seeks relief pursuant to the Act in an amount greater than Fifty Thousand Dollars ($50,000), exclusive of fees and costs.

9.      The Attorney General seeks equitable relief, declaratory relief, civil penalties, injunctive relief, attorneys' fees and costs, actual damages on behalf of injured consumers, and any other relief against the Defendants pursuant to Florida law both on behalf of the Attorney General and the Florida consumers the Attorney General is charged to protect.

10.      The Fourteenth Judicial Circuit has subject matter jurisdiction pursuant to the provisions of Chapter 501, Part II, Florida Statutes.

11.      Venue is proper in the Fourteenth Judicial Circuit because Defendants operate in more than one judicial circuit in the State of Florida, including Gulf County and the Fourteenth Judicial Circuit.

12.      The Fourteenth Judicial Circuit has personal jurisdiction over all Defendants in this action under Florida's long-arm statute, § 48.193(1)(a), Fla. Stat.

13.      Defendants each conduct a business or business venture in the State of Florida.

14.     Defendants each have committed torts within the State of Florida by sending misleading or unfair communications to their clients in Florida.

15.     Defendants have significant suit-related contacts with Florida and have availed themselves of the benefits of transacting business in Florida.

16.     To name just a couple of examples, Glass Lewis includes as clients Office Depot[1] and Raymond James[2]—both large companies headquartered in Florida. And ISS clients include GQG Partners,[3] also headquartered in Florida, and BlackRock, which operates several offices in Florida. On information and belief, Glass Lewis and ISS both have many more clients headquartered or incorporated in Florida.

17.     Both ISS and Glass Lewis provide their commercial services to the Florida State Board of Administration (SBA), which manages the Florida Retirement System. The Florida Retirement System covers the majority of public employees in the state of Florida.

18.     The SBA has contracted to receive proxy-voting advice and other investment services from ISS since 1988.

---

[1] *Conflicts of Interest by Proxy and Meeting Date Report*, GLASS LEWIS (Apr. 20, 2023), GL_0001533

[2] *Id.*

[3] *Environmental, Social & Governance (ESG) and Stewardship Policy*, GQG PARTNERS (Jan. 2025), https://perma.cc/NN8N-EZBD.

19.     The SBA has contracted to receive proxy-voting advice and other investment services from Glass Lewis since 2003.

20.     These contracts create many continuing obligations on behalf of Glass Lewis and ISS. Both Glass Lewis and ISS contractually agree to follow Florida laws related to the retention of SBA's documents and the hiring of illegal aliens.

21.     These contracts are generally renewed by the parties on an annual basis after negotiations about price and services.

22.     The SBA paid Glass Lewis approximately $230,000 in Fiscal Year 2025 and expects to pay ISS a similar amount in Fiscal Year 2026. Between 2020 and 2024, the SBA paid Glass Lewis approximately $1,332,000 for its services. The services that Glass Lewis provides to SBA include global proxy-research services, and access to various corporate-governance data sets. Glass Lewis's Viewpoint proxy-voting platform casts and records all SBA proxy-voting transactions and provides related reporting and recordkeeping. Glass Lewis is registered to do business in the State of Florida.

23.     The SBA paid ISS approximately $265,000 in Fiscal Year 2025 and expects to pay ISS a similar amount in Fiscal Year 2026. Between 2020 and 2024, the SBA paid ISS approximately $1,673,000 for its services. The services that ISS provides to SBA include global proxy-research services, access to various corporate-

governance data sets, and extensive company-level research tied to statutory divestment requirements.

24. SBA staff and Defendants are in constant communication about their decades-long contractual relationships. Those communications are related to the Defendants' proxy advice, including DEI- and ESG-related advice which is the subject of this Complaint.

25. Glass Lewis employees communicate with employees in the SBA's Investment Programs and Governance (IPG) team on a weekly basis. These communications from Glass Lewis are sent into Florida via email, phone, and online video calls.

26. These communications include email solicitations and client alerts sent from Glass Lewis to SBA employees concerning Glass Lewis's latest products and research. The purpose of these solicitations and client alerts is to retain SBA as a client and induce SBA to purchase additional products from Glass Lewis.

27. These emails also include personalized communications to SBA employees about SBA's voting needs, managing the Glass Lewis voting software, and other day-to-day needs of SBA's IPG team.

28. Glass Lewis also sends client surveys to SBA on at least an annual basis. These surveys request SBA's advice pertaining to Glass Lewis's proxy-voting policies, including the use of DEI and ESG to formulate proxy advice, as discussed

7

in this Complaint. SBA completes these annual surveys at the request of Glass Lewis. After the surveys are complete, Glass Lewis sends out the results of the survey, which include a copy of its Benchmark Policy.

29. ISS communicates with SBA employees in the IPG team on a weekly basis. These communications from ISS are sent into Florida via email, phone, and online video calls. These communications cover a wide variety of proxy-voting issues, governance-research items, and general client operational support.

30. The communications from ISS to the SBA include email solicitations and client alerts concerning ISS's latest products and research. The purpose of these solicitations and client alerts is to retain the SBA as a client and induce SBA to purchase additional products from ISS.

31. ISS also sends client surveys to the SBA on at least an annual basis. These surveys request the SBA's advice pertaining to ISS's proxy-voting policies, including the use of DEI and ESG to formulate proxy advice, as discussed in this Complaint. SBA completes these annual surveys at the request of ISS. After the surveys are complete, Glass Lewis sends out the results of the survey, which include a copy of its Benchmark Policy.

32. The communications described above were sent into the State of Florida because the recipient was located in Florida.

33. On information and belief, Defendants are also in constant communication with their other Florida-based clients. These Florida-based clients include, but are not limited to Office Depot, Raymond James, GQG Partners, and Blackrock.

34. On information and belief, these communications with Florida-based clients include the transmittal of Glass Lewis's and ISS's benchmark policies to clients in Florida.

35. Defendants' services have a massive impact on the investment plans of Floridians.

36. In Fiscal Year 2024, for example, the Florida Retirement System had 659,333 active members and provided retirement income benefits to 459,428 retirees. Including Deferred Retirement Option Program (DROP) participants (29,017) and vested terminated members (117,142), the total number of retirement participants was approximately 1.26 million Floridians.

37. Defendants' services to the Florida Retirement System impacts an astronomical amount of retirement money in Florida. As of September 30, 2025, the Pension Plan held $218.6 billion in total assets, while the Investment Plan held $21.6 billion, for a combined total of approximately $240.3 billion.

38. It is well established that "[p]roxy advisory actions—recommendations to investors, retirement funds, and large asset managers on how to vote their shares,

and their clients' shares, in public companies—directly affect the financial well-being of more than 100 million Americans."[4] Millions of these Americans are Floridians, including vulnerable retirees who depend on responsible management of their retirement funds.

39.     In sum, Defendants conduct extensive business in Florida and at least hundreds of thousands of Florida employees' retirement plans, plus a dollar amount well into the billions, are directly impacted by Defendants' offering of services in the State.

40.     The conduct described in this Complaint and the harm caused by Defendants arise from Defendants' activities directed to Florida and its residents.

**PARTIES**

41.     The Attorney General is an enforcing authority of Chapter 501, Part II, Florida Statutes, and is authorized to bring this action for equitable relief, declaratory relief, civil penalties, injunctive relief, attorney's fees and costs, and other relief pursuant to this chapter of state law.

42.     The Attorney General has conducted an examination of the matters alleged and has determined that this enforcement action against Defendants serves the public interest.

---

[4] Benjamin Zycher, *As Firms Back Away from ESG, Congress Must Reform Proxy Voting*, THE HILL (Oct. 29, 2025), https://perma.cc/84Y7-RCC4.

43.     Defendant ISS is a proxy advisor firm that operates globally, including in Florida. ISS is majority owned by Deutsche Börse Group.

44.     Defendant Glass Lewis is a proxy advisor firm that operates globally, including in Florida. Glass Lewis is owned by Peloton Capital Management and Stephen Smith, a financial services entrepreneur.

## TRADE AND COMMERCE

45.     The Proxy Advisor Companies have engaged in trade or commerce as defined in Section 501.203(8), Florida Statutes.

46.     Under FDUTPA, "[t]rade or commerce" means the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated," and "shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity." § 501.203(8), FLA. STAT.

47.     Both ISS and Glass Lewis sell a service by offering and providing—via sale and for profit—their service of proxy advice to paying clients.

48.     The Proxy Advisor Companies' paid services to clients qualify as the offering or sale of a service under FDUTPA.

11

## FACTUAL ALLEGATIONS

### I.      ISS and Glass Lewis Dominate the Proxy-Advising Market.

49.      For most publicly traded companies in the United States, shareholders receive voting rights with their purchase of shares.[5] Shareholder voting rights are typically allocated on a "one share, one vote" basis, and enable shareholders to voice their opinions on a wide array of business decisions that influence the value of their shares.

50.      Shareholder votes are binding on many important matters.[6] In addition to electing board members, which in turn influences virtually every major decision a company makes, many decisions, including granting employees equity in the firm and mergers or acquisitions of the firm, require *direct* approval by voting shareholders.[7]

51.      Shareholders hold a vested interest in the financial future of the company in which they own shares and face a strong incentive to support votes that align with their interests. Given the modern norm of diversified portfolios and institutional investors like mutual funds, index funds, hedge funds, and pension funds, however, a single fund may correspond to hundreds of thousands of

---

[5] David F. Larcker et al., *The Big Thumb on the Scale: An Overview of the Proxy Advisory Industry*, HARV. L. SCH. F. CORP. GOVERNANCE (June 14, 2018), https://perma.cc/ND97-85GA.
[6] *Id.*
[7] *Id.*

shareholder votes each year.[8] With up to hundreds of thousands of votes to consider, tracking the happenings of each company to make informed votes becomes practically difficult for many institutional investors.[9]

52.    For this reason, proxy advising firms offer consulting services to clients like institutional investors—who in turn represent ordinary shareholders with money invested in the institutional fund—with the promise of providing detailed information about upcoming votes and making recommendations on how clients should vote in their best interest.[10]

53.    This market for proxy voting advice is dominated almost entirely by two firms: Glass, Lewis & Co. (Glass Lewis) and Institutional Shareholder Services (ISS).[11]

54.    These two firms alone control *97 percent* of the proxy advice market.[12]

55.    These market-dominant companies operate at a massive financial scale. Glass Lewis alone boasts of advising shareholders that oversee *$40 trillion* in assets.[13]

---

[8] James K. Glassman & Hester Peirce, *How Proxy Advisory Services Became So Powerful*, MERCATUS CTR. (June 18, 2014), https://perma.cc/82YK-GVDR.

[9] *Id.*

[10] Larcker, *supra*, n.5.

[11] *Id.*

[12] Glassman & Peirce, *supra*, n.8; *see also* Zycher, *supra*, n.4.

[13] *Who We Are*, GLASS LEWIS, https://perma.cc/HBT4-XFP8.

56.     Glass Lewis notes that "Glass Lewis clients . . . include the majority of the world's largest public pension funds, asset managers and mutual funds."[14]

57.     ISS does not disclose its equivalent dollar amount but describes advising 4200 clients—including "the world's leading institutional investors."[15]

58.     Because institutional investors hold 70 percent of all public shares in the United States, the voting recommendations of these two proxy-advisor companies have a massive impact on the economy.[16]

**II.     ISS and Glass Lewis Impose Their Radical Ideological Agenda Into Their Services.**

59.     Glass Lewis and ISS bring to bear their joint ideological agenda onto the companies for which they provide proxy-voting advice by threatening negative voting recommendations if companies do not affirmatively support their agenda. As cataloged below, they insist on ideological compliance with—among other controversial positions—racial quotas, a notion of "gender identity" that accepts genders beyond male and female, and a view that *every* company must actively fight "global climate change."

---

[14] Katherine Rabin, *Statement of Record for SEC Roundtable on the Proxy Process*, HARV. L. SCH. F. CORP. GOVERNANCE (Nov. 21, 2018), https://perma.cc/4A2J-MH8T.

[15] *About ISS*, ISS, https://perma.cc/EX4L-4S4J.

[16] Larcker, *supra*, n.5.

60.   The Defendants tout their requirements for what has been dubbed "ESG"—or environmental, social, and governance issues.

61.   "The proxy advisors make recommendations that do not affect their own financial interests, allowing them to indulge their political preferences with little concern for the fiduciary interests of retirees and shareholders."[17]

62.   "The result has been a steady stream of endorsements by these two firms of proxy proposals promoting 'environmental, social, and governance' objectives, the central examples of which are climate-related mandates, fossil fuel divestments, racial and gender quotas for corporate boards, and other such blatant political initiatives often inconsistent with the maximization of shareholder value."[18]

63.   Reliance on so-called ESG is highly controversial and, in many cases, illegal. Indeed, a *majority* of States have now passed legislation restricting reliance on ESG factors.[19] An even wider majority of States either ban ESG or promote divestment from industries that promote ESG.[20] Florida law restricting reliance on ESG is especially robust.

---

[17] Zycher *supra*, n.4.

[18] *Id.*

[19] *Navigating State Regulation of ESG*, ROPES & GRAY, https://perma.cc/N35Y-6LMQ.

[20] *Id.*

64.    Glass Lewis admits that "ESG themes have long been covered in Glass Lewis research."[21] And it declares: "we have been collecting information concerning companies' ESG risks and opportunities since our inception as an organization."[22]

65.    ISS similarly declares that every "company's governance, social, and environmental practices should meet or exceed the standards of its market regulations and general practices . . . . Issuers and investors should recognize constructive engagement as both a right and responsibility."[23]

66.    Glass Lewis and ISS both enforce a particularly extreme and controversial version of ESG. Yet Defendants acknowledge internally, but not publicly, that their brand of ESG is either unrelated or antithetical to long-term shareholder value.

67.    In the course of promoting its ESG agenda, Glass Lewis seeks to impose and enforce racial quotas and sexuality quotas on all corporate boards subject to its review. Glass Lewis "will generally recommend against the chair of the nominating committee of a board with fewer than one director from an

---

[21] Press Release, Glass Lewis, Glass Lewis Launches ESG Scores and Data to Give Investors Insights Needed for Informed Voting and Engagement Decisions (Feb. 7, 2022), https://perma.cc/NR5P-X4S7.

[22] Press Release, Glass Lewis, Glass Lewis Launches ESG Data Feed Providing Investors Timely Access to Key ESG Data Points (June 15, 2022), https://perma.cc/U5XS-MCFG.

[23] *ISS Global Voting Principles*, ISS, https://perma.cc/W86X-P7DY.

underrepresented community on the board at companies within the Russell 1000 index."[24]

68.     Glass Lewis is explicit that these quota requirements are based purely on race and sexuality—not board member experience, upbringing, or any other more holistic measure. Glass Lewis is clear: "We define 'underrepresented community director' as an individual who self-identifies as Black, African American, North African, Middle Eastern, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaskan Native, or who self-identifies as a member of the LGBTQIA+ community,"[25] which stands for Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual, and other sexual-minority community.

69.     Glass Lewis creates "ratings" for whether a company has sufficiently complied with Glass Lewis's racial balancing goals.[26]

70.     In its Benchmark Guidelines, which apply presumptively to all clients, Glass Lewis also lays out a policy of enforcing strict quotas based on its own understanding of "gender diversity." In particular, Glass Lewis flags any companies whose "board . . . is not at least 30 percent gender diverse."[27] Glass Lewis defines "gender diverse" as including a specific number of "[w]omen and directors that

---

[24] *2025 Benchmark Policy Guidelines* at 41, GLASS LEWIS, https://perma.cc/9JFW-HKEM.
[25] *Id.*
[26] *Id.* at 42.
[27] *Id.* at 26.

17

identify with a gender other than male or female."[28] In other documents, Glass Lewis makes clear that its gender-diversity definition includes "any non-binary directors, should they self-identify as such."[29]

71.    Glass Lewis also factors its conception of environmental activism into its Benchmark Policy recommendations. "Glass Lewis will generally recommend voting against the governance committee chair of a company in the Russell 1000 index that fails to provide explicit disclosure concerning the board's role in overseeing [climate change] issues."[30]

72.    Glass Lewis actively enforces its climate change ideology. "Glass Lewis carefully monitors companies' performance with respect to environmental and social issues, including those related to climate."[31] "In situations where we believe that a company has not properly managed or mitigated material environmental or social risks . . . Glass Lewis may recommend that shareholders vote against the members of the board who are responsible for oversight of environmental and social risks."[32]

73.    Internal documents reveal that Glass Lewis has coordinated with the controversial group Climate Action 100+, an association of institutional investors

---

[28] *Id.* at 26 n.27.
[29] *Glass Lewis ESG Profile Methodology*, GL_ EMAIL-0029233, at 11.
[30] *2025 Benchmark Policy Guidelines*, *supra*, n.24 at 26–27.
[31] *Id.* at 30.
[32] *Id.*

who the United States House Judiciary Committee called a "woke ESG cartel."[33] Climate Action 100+ seeks to use collective action amongst asset managers to, among other things, reduce coal output by 91%.[34] Climate Action 100+ has faced criticism and legal action against its members for alleged violations of the antitrust laws.

74.    Glass Lewis has also coordinated directly with Ceres, another controversial climate association that purports to bind participants.[35] Ceres, among other things, has been accused of cajoling "members of the finance industry into pushing harmful, anti-consumer 'net zero' targets at every major public company in the country."[36] Ceres and Glass Lewis coordinated on specific voting recommendations, with Ceres providing recommendations like: "vote for item 5*," "vote for item 6 report on supply chain GHG emissions," and "vote for item 5 integrate ESG into executive compensation."[37]

---

[33] Loes van Dijk, *Climate Action 100+ Under Fire as House Judiciary Cites Antitrust Concerns*, CLIMATE COURT (Aug. 6, 2024), https://perma.cc/ZD2B-JVAZ.
[34] *Investor Expectations for Diversified Mining* at 37, CLIMATE ACTION 100+ (2023), https://perma.cc/6PWY-DJKP.
[35] *See, e.g.*, E-mail from Mindy Lubber, Ceres to Courtney Keatings, Glass Lewis (Dec. 12, 2017 at 6:19pm), GL0001195; E-mail from Tracey Cameron to Courtney Keatings, Glass Lewis (May 13, 2022 at 8:18 pm), GL0001384; E-mail from Tracey Cameron to Courtney Keatings, Glass Lewis (Oct. 13, 2021 at 5:58 pm), GL0001814; E-mail from Tracey Cameron to Courtney Keatings, Glass Lewis (Dec. 20, 2021 at 8:33pm), GL0001921.
[36] The Ceres Report at 1, CONSUMERS' RSCH (2022), https://perma.cc/53C4-N3GR.
[37] E-mail from Rob Berridge, Ceres to Courtney Keatings, Glass Lewis (May 4, 2020 at 4:57pm), GL0002043.

75.     Glass Lewis has put its ideological agenda into action. "Glass Lewis recommended against a number of directors on account of what we viewed as mismanagement of environmental and social risks."[38] "Specifically with regard to climate risk, Glass Lewis recommended, for a third year in a row, that shareholders vote against directors at Berkshire Hathaway Inc. because of our concerns regarding its lack of acknowledgment of climate-related risks and its preparedness for such risks."[39] "We find Berkshire to continue to be a clear laggard with respect to its disclosure and oversight of climate-related issues," Glass Lewis warned.[40]

76.     The same is true of Glass Lewis's effort to enforce vague social "norms"—never defined or limited. Glass Lewis pushed its clients to vote in favor of a proposal "requesting that Tesla Inc. establish a public policy committee to oversee its policies including human rights, environment, domestic governmental regulations, foreign affairs and international relations affecting its business."[41] "We were broadly concerned," Glass Lewis explained, "with Tesla's significant exposure to legal, reputational, and regulatory risks associated with the company's oversight of public policy issues."[42]

---

[38] *Glass Lewis Shareholder Proposals Proxy Season Review 2023*, GL_0004038, at 22.

[39] *Id.*

[40] *Id.*

[41] *Glass Lewis 2019 Season Review-U.S. Shareholder Proposals*, GL0007166, at 8–9.

[42] *Id.* at 9.

77.     And Glass Lewis's environmentalist agenda—which seeks to require corporate board members to affirmatively support—is extreme. It does not distinguish between companies for which environmental issues may actually pose an impact on shareholder value and those for which it does not. "Given the exceptionally broad impacts of a changing climate on companies, the economy, and society in general, [Glass Lewis] view[s] climate risk as a material risk for *all companies*."[43]

78.     Glass Lewis also enforces controversial ESG mandates in its policies specific to public pensions. For example, Glass Lewis states in its 2024 Public Pension Policy Guidelines: "The policy has been updated to provide that, if less than 30% of the board is female, the Public Pension Policy will vote against the entire incumbent male nominating committee; however, where local market standards dictate a *higher* level of expected gender diversity, the Public Pension Policy will follow the local market requirement."[44]

79.     Glass Lewis also applies its extreme global climate change agenda on public pensions. It states: "For companies included in the Climate Action 100+ focus list and those that operate in industries where the Sustainability Accounting Standards Board (SASB) has determined that greenhouse gas ("GHG") emissions

---

[43] *2025 Benchmark Policy Guidelines*, *supra*, n.24 at 30 (emphasis added).
[44] *Public Pension Thematic Voting Policy Guidelines* at 5, GLASS LEWIS (2024), https://perma.cc/9QZ3-VS6L (emphasis added).

represent a financially material risk, the Public Pension Policy will vote against the chair of the board in instances where a company has not adopted a *net zero emissions target* or ambition."[45]

80.    Glass Lewis has imposed and enforced its joint ideological agenda on corporate boards consistently for several years.[46]

81.    Glass Lewis has enforced its ESG agenda by creating and monitoring an "ESG Profile" and "ESG Data Feed solution," which catalogs Glass Lewis's ESG findings as to individual companies.[47]

82.    Glass Lewis has also joined several foreign agreements that promote the use of ESG and similar ideologies in corporate decision making.[48]

83.    ISS has also acted to enforce extreme forms of ideological ESG, including gender- and race-based balancing and demands that every company focus on reducing greenhouse gas emissions. In its Proxy Voting Guidelines Benchmark

---

[45] *Id.* at 12 (emphasis added).

[46] *2021 Proxy Paper Guidelines: An Overview of the Glass Lewis Approach to Proxy Advice*, GLASS LEWIS (2021), https://perma.cc/C3KV-XFFH; *Glass Lewis Proxy Season Review 2022*, GL_0002681; Press Release, Glass Lewis Launches ESG Data Feed Providing Investors Timely Access to Key ESG Data Points, *supra*, n. 24.

[47] *Id.*

[48] Glass, Lewis & Co., (@GlassLewis), X (Mar. 13, 2025 at 4:00 pm ET), https://perma.cc/D5R3-AEUQ; Glass, Lewis & Co., (@GlassLewis), X (Sep. 27, 2022 at 10:09 am ET), https://perma.cc/HDC9-GY2V; *How Glass Lewis Helps Investors Meet the UN PRI Principles and Reporting Requirements*, GLASS LEWIS (June 19, 2025), https://perma.cc/LVY3-YCCS.

Policy Recommendations, which apply presumptively to all clients, ISS lists the following directives:

> a. "Generally vote against . . . companies where there are no women on the company's board."[49]
>
> b. "For companies in the Russell 3000 or S&P 1500 indices, generally vote against . . . where the board has no apparent racially or ethnically diverse members."[50]
>
> c. "For companies that are significant greenhouse gas (GHG) emitters . . . generally vote against . . . in cases where ISS determines that the company is not taking the minimum steps needed to understand, assess, and mitigate risks related to climate change."[51]

84.    ISS is similar to Glass Lewis yet again as to its Public Fund Proxy Voting Guidelines. ISS has stated broadly: "The Public Fund Policy is generally supportive of governance and ESG shareholder resolutions."[52]

---

[49] *United States Proxy Voting Guidelines Benchmark Policy Recommendations* at 12, ISS (Feb. 1, 2024), https://perma.cc/N9TG-B7X9.
[50] *Id.*
[51] *Id.* at 17.
[52] *Public Fund Proxy Voting Guidelines*, ISS (Jan. 2024), https://perma.cc/WNV2-TFPR.

85.     Just like Glass Lewis, ISS is also a member of foreign organizations that require it to place ideology into its calculus when making recommendations.[53]

### III.   ISS and Glass Lewis Deceive Florida Consumers.

#### A. ISS and Glass Lewis Deceptively Claim They Increase Shareholder Value.

86.     Defendants deceive Florida consumers by claiming that they seek to maximize shareholder value rather than promote their own ideological goals.

87.     To illustrate just a few of the countless examples of Defendants' deceptive statements:

88.     Glass Lewis claims that "[t]he purpose of Glass Lewis' proxy research and advice is to facilitate shareholder voting in favor of governance structures that will drive performance, create shareholder value and maintain a proper tone at the top."[54]

89.     ISS claims that its "Benchmark Voting Policy," which reflects its ideological agenda, is "designed to promote long-term shareholder value, good governance and risk mitigation . . . "[55]

---

[53] Financial Reporting Counsel, UK Stewardship Code Signatories, (August 13, 2025), https://perma.cc/KY2F-A3GP.

[54] 2025 Benchmark Policy Guidelines, *supra*, n.24 at 9.

[55] Letters from Kevin Cameron, Exec. Chair, Glass Lewis, & Gary Retelny, President & CEO, ISS, to State Treasurers and Financial Officers (June 29, 2023), https://perma.cc/7VJX-26NA.

90.    "Of course," ISS guarantees, "our ultimate goal is long-term shareholder value creation and risk mitigation."

91.    ISS declares clearly: "[m]aximizing and protecting shareholder value in the long term is the ultimate goal of ISS' benchmark policy."[56]

92.    In reality, Defendants' commitments to ideological social justice efforts do the very opposite of what they claim—they objectively *decrease* shareholder value by injecting considerations other than financial performance into the analysis. And Defendants acknowledge as much internally.

93.    Defendants' public contrary claims are either outright false, or at least likely to mislead a reasonable Florida consumer. Defendants know—or should know—that the well-documented evidence makes their contrary claims to Florida consumers deceptive.

94.    ESG investing like Defendants' has objectively and consistently underperformed compared to the S&P 500. The S&P 500 tracks the performance of roughly 500 of the largest U.S. companies, serving as a general indicator of the

---

[56] *ISS United States Procedures & Policies (Non-Compensation) Frequently Asked Questions* at 38 (Oct. 4, 2021), ISS-FL-00001390, at -1427; *United States Procedures & Policies (Non-Compensation): Frequently Asked Questions* at 38, ISS (Feb. 25, 2025), https://perma.cc/G89E-ZWD6; *see also Business Practices & Principles*, ISS, https://perma.cc/9WC2-53KM; *Due Diligence Questionnaire*, ISS (July 2022), ISS-FL-00108150; *About ISS, supra*, n.15.

overall market. Thus, Defendants' ESG-tinged advice leaves clients and investors worse off than if they had simply tracked the market generally.

95.     This decrease in shareholder value is *significant*—with estimates putting the discrepancy between ESG investing and simply tracking the overall market at an over 11% decrease in value. "ESG investing has underperformed the S&P 500, with the Kiplinger ESG 20 returning 4.3% over the past year, compared to the index's 15.9% return."[57]

96.     This makes sense. "[A]rtificial constraints on investment options—'divest from fossil fuels!'—cannot improve investment returns to a portfolio over the longer term and are inconsistent with the diversification needed to maximize expected returns."[58]

97.     For example, Glass Lewis specifically recommends that energy companies "*scale[] back operations*"[59]—never explaining how it could possibly be the case that scaling back operations would increase financial growth for an energy company.[60]

---

[57] *ESG Investing Underperforms S&P 500: Why AI Stocks Made the Cut*, AINVEST (Oct. 25, 2025), https://perma.cc/WPM2-JWEE.

[58] Zycher, *supra*, n.4.

[59] *Glass Lewis Shareholder Proposals Proxy Season Review* at 46 (2023), GL_0004038, at -4083 (emphasis added).

[60] *Id.*

98.   Glass Lewis "recommended in favor of 100% of climate reporting proposals" in 2021—*every single* climate reporting proposal.[61] Glass Lewis did not explain how it could be the case that every climate reporting proposal increased every company's value for shareholders.

99.   Glass Lewis also universally supported climate *lobbying* efforts—never explaining how lobbying a company is conducive to increasing value for investors. "In fact, in 2020 Glass Lewis recommended in favor of 100% of . . . climate lobbying . . . at US companies."[62]

100.   Even if Defendants somehow prevail in their gamble that commitment to ideological social justice initiatives of Defendants' choosing will increase shareholder value in the *long*-term, they continue to deceive Florida consumers about the short- and medium-term impacts of focus on these efforts at the expense of traditional metrics of financial growth.

101.   A reasonable Florida consumer and institutional investor would assume that Defendants focus so intently on ESG causes because they have *some* relevance to Defendants' core claim of increasing shareholder value. After all, Defendants directly tie their ideological causes to their claims of increasing shareholder value.

---

[61] *Glass Lewis Shareholder Proposals Proxy Season Review* at 40 (2021), GL0007740, at -7779.

[62] *Systematically considering and progressively incorporating the transition to a Net Zero economy into the Glass Lewis benchmark policy*, GLASS LEWIS, GL0006278.

In fact, Defendants' social justice efforts are—at best—entirely irrelevant to maximizing shareholder value, if not affirmatively contradictory.

### B. ISS and Glass Lewis Deceptively Boast an Objective, Evidenced Basis for their ESG Agenda.

102. Defendants deceptively assure consumers and investors that their recommendations are based on rigorous analysis and also assure their customers that there is an objective basis for their commitment to ideological social justice causes over traditional metrics of financial growth. In fact, Defendants' statements are not based on substantial evidence or objective reality. Rather, Defendants' claims are based on experimental and controversial notions about the impact that social justice commitments *may* have on some conception of "reputational value" that is not evidence-based. Often, there is no analysis at all supporting Defendants' recommendations—just ideology.

103. Tellingly, the vague "reputational" harms Defendants gesture to are associated with a left-wing ideology. Defendants do not put a similar focus on concerns from other perspectives. To name just a few examples, Defendants apparently are silent on the reputational concerns associated with matters such as companies employing illegal immigrants in their workforces, not manufacturing products in the United States, or manufacturing products in communist China. Defendants' one-sided focus demonstrates that Defendants' vague "reputational"

28

worries are simply a thinly veiled, poorly explained political and ideological agenda—not a genuine concern for shareholder value.

104.   Defendants' deceptive statements abound. To highlight just a few examples:

105.   ISS touts its recommendations as based on "high-quality data" and "analytics."[63]

106.   ISS advertises its ESG scoring system as "a data-driven scoring and screening solution designed to measure and identify areas of environmental and social risk."[64]

107.   ISS claims that its ESG scoring system is "supported by factor-level data."[65]

108.   ISS claims that "[t]he degree to which . . . ISS incorporates certain factors into its analysis and vote recommendations . . . is grounded in [a] neutral and analytical perspective."[66]

---

[63] *Proxy Voting Guidelines Benchmark Policy Recommendations*, *supra*, n.49 at 87; *Due Diligence Questionnaire*, ISS (July 2022), ISS-FL-00108150; *see also About ISS*, *supra*, n.15; ISS-FL-00097065.

[64] *Statement in Connection with Planned Methodology Update for Environmental & Social Disclosure QualityScore*, ISS INSIGHTS (Sept. 24, 2025), https://perma.cc/WPJ3-8Y5K.

[65] *Id.*

[66] Letter from Gary Retelny, President & CEO, ISS, to Sean Reyes, Utah Att'y Gen. et al. at 10 (Jan. 31, 2023), https://perma.cc/VEU2-9NGZ.

109.    ISS claims that its voting policies "incorporate a rigorous analysis of ESG topics."[67]

110.    ISS states that it maintains "[r]igorous internal review processes for research and data."

111.    Glass Lewis claims that it provides "expert analysis" and "accurate data" for "voting recommendations for all the companies in our clients' portfolios."[68]

112.    Glass Lewis assures the public that "our role is not to advocate or seek to persuade our clients to . . . vote in any particular way on a ballot item. And we certainly have not made any 'pledge' or 'commitment' as to their votes. Our role is to provide *objective* research and other tools to help our clients vote as they see fit."[69]

113.    Glass Lewis claims that it "*carefully* reviews proposals requesting the implementation of equal employment principles in order to determine whether the actions requested of the company will *clearly* lead to the protection or enhancement of shareholder value."[70]

---

[67] *Due Diligence Questionnaire*, ISS (July 2022), ISS-FL-00108150, at -8159.
[68] Glass, Lewis & Co., (@GlassLewis), X (Apr. 12, 2022 at 12:08 pm ET), https://perma.cc/2Z2A-K2VZ.
[69]  Letter from Kevin Cameron, Exec. Chair, Glass Lewis, to Att'ys Gen at 2 (Jan. 31, 2023), https://perma.cc/A92F-4D5U (emphasis added); *2024 Sustainability Report*, GLASS LEWIS, https://perma.cc/7FSH-JP47 (commitment to "objectivity).
[70] Guidelines, An Overview of the Glass Lewis Approach to Proxy Advice, ESG Initiatives, GLASS LEWIS (2021), GL_0000665, at -688 (emphasis added).

114. Glass Lewis claims that it "provides in-depth research, data, and customized engagement and voting solutions."[71]

115. In reality, Defendants' laser focus on pursuing their own ideological agendas—and their requirements that corporate boards publicly ratify the same ideas— do not have an objective, analytical basis.

116. Glass Lewis focuses on ideological issues that are blatantly immaterial to financial performance. Glass Lewis recommended action against a company that supported candidates and an organization that have "championed voter suppression" and worked to "weaken women's access to abortion."[72] Glass Lewis declared, without explanation, that its recommendation "will clearly lead to the protection or enhancement of long-term shareholder value."[73]

117. Defendants also have fixated on holding companies to irrelevant external benchmarks. For example, they insist that private companies meet the requirements laid out in the Paris Agreement, an international treaty related to climate change.

---

[71] *Investment Stewardship Solutions to Help Pension Funds*, GLASS LEWIS, https://perma.cc/E2PS-UMWR.
[72] Charter Communications, Inc. Annual Meeting (Apr. 26, 2022), GL_Files-0000869, at 23.
[73] *Id.* at 31.

118.    Defendants fail to sufficiently define key terms, like "materiality," and seek to confuse consumers by muddling ill-defined concepts like "diversity" and "sustainability."

119.    Both companies permit their clients and potential clients to select an "ESG" package—implying that other available options do not support ESG.[74] In fact, *all* Defendants' recommendations—including their standard or "Benchmark Policies" cataloged above—include enforced commitments to ESG.

120.    And both companies have failed in particular to provide a sufficient basis in evidence for their insistence on outright racial, gender, and sexuality quotas in corporate board membership. At most, Defendants provide vague support for the notion that "diversity" benefits board membership without justifying their extreme position of outright numerical quotas. And Defendants fail to disclose or reckon with compelling evidence contrary to their position.[75] For example, even studies *favorable* to forced gender quotas acknowledge the reality of negative stock market performance associated with forced quotas.[76] For example, a study that

---

[74] *ESG*, *Thematic Voting Policy*, GLASS LEWIS (2024), https://perma.cc/PL9X-9ASG; *Climate*, *Thematic Voting Policy Guidelines*, GLASS LEWIS (2024), https://perma.cc/23Q3-ME9V.

[75] *See, e.g.*, Alina Dizik, *Do Quotas for Corporate Boards Help Women Advance?*, CHI. BOOTH REV. (June 15, 2015), https://perma.cc/9QBJ-K2U7 (noting that mandatory gender quotas imposed in other countries have brought "mixed results").

[76] Costanza De Acutis et al., *The Effects of Board Gender Quotas: A Meta-Analysis*, 91 LABOUR ECON. (2024), https://perma.cc/AY59-ZYDD.

"synthesize[d] the findings from the active literature studying the effects of gender boardroom quota policies" concluded that a "strong negative coefficient for outcomes related to stock market performance remains significant."[77]

121. The fact that prevailing studies have concluded that "stock market returns are most negatively affected by quota policies"[78] is highly material, and it flatly contradicts Defendants' claims that they increase shareholder value by engaging in evidenced-based analysis.

**IV. ISS and Glass Lewis Deceive Consumers By Recommending—and Enforcing—Requirements for Discrimination that are Highly Suspect Legally.**

122. As cataloged above, Defendants recommend that their clients adopt strict racial, gender, and sexuality quotas in board membership and vote against proposals from boards that fail to adhere to Defendants' quotas for racial and gender composition.

123. Until it changed policies last year, ISS admitted to "consider[ing] the gender and racial and/or ethnic diversity of a company's board when making vote recommendations with respect to the election or re-election of directors at U.S. companies under its Benchmark and Specialty policies."[79]

---

[77] *Id.* at 17, 19.

[78] *Id.* at 20.

[79] *Statement Regarding Consideration of Diversity Factors in U.S. Director Election Assessments*, ISS INSIGHTS (Feb. 11, 2025), https://perma.cc/7GUR-ML7Z.

124. Glass Lewis likewise adopts quotas, stating it "will generally recommend against the chair of the nominating committee of a board with fewer than one director from an underrepresented community on the board at companies within the Russell 1000 index."[80] Glass Lewis defines " 'underrepresented community director' as an individual who self-identifies as Black, African American, North African, Middle Eastern, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaskan Native, or who self-identifies as a member of the LGBTQIA+ community."[81]

125. Blatant racial quotas, which necessarily require discriminating on the basis of race, are highly suspect under prevailing law.

126. Under 42 U.S.C. § 1981(a), for example, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a). This protection extends even to non-state actors, as "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination." *Id.* § 1981(c).

127. At the very least, outright racial balancing creates significant and unjustifiable legal risks for companies and state agencies that follow Defendants' recommendation to engage in it.

---

[80] *2025 Benchmark Policy Guidelines*, *supra*, n.24 at 41.
[81] *Id.*

34

128.    For example, in Florida, any retirement system or plan must consider only pecuniary factors—and thus not ESG—when making shareholder rights related decisions.[82]

129.    Thus, while it recommends *legally suspect* action, Glass Lewis assures consumers that it *ensures* regulatory compliance. Glass Lewis insists that "Glass Lewis' Proxy Voting Policies offer institutional investors market-specific guidelines for voting on annual general meeting proposals, helping them meet . . . *regulatory requirements*."[83] Similarly, ISS claims that its policies and recommendations "tak[e] into account relevant laws" of "markets and regions."[84]

## V.    The Structure of the Proxy-Advice Market Insulates Glass Lewis and ISS from Investor Dissatisfaction

130.    Together, Defendants dominate over 90% of the proxy advisor market, with the most recent estimates as high as 97%.[85]

131.    As of 2021, estimates placed ISS's market control at 48% of the proxy advice market for U.S. mutual funds, with assets totaling $26.8 trillion from 144

---

[82] *Navigating State Regulation of ESG*, ROPES & GRAY, *supra*, n.21.
[83] *Enhance Decision-Making with Consistent Proxy Voting Policies*, GLASS LEWIS, https://perma.cc/5VYP-HW5R (emphasis added).
[84] *Due Diligence Questionnaire*, ISS (July 2022), ISS-FL-00108150, at 8172.
[85] Editorial Board, *Cracking the Proxy Advisory Duopoly: Glass Lewis and ISS have a 97% Market Share and Conflicts of Interest*, WALL. ST. J. (July 12, 2023), https://perma.cc/677C-NBPR.

fund families.[86] Glass Lewis held 42%, with $23.6 trillion in assets across 94 fund families.[87]

132.    Because they dominate the market, Glass Lewis and ISS are largely insulated from the market forces that would otherwise prevent them from giving false, deceptive, misleading, or otherwise faulty advice.

133.    Normally, an entity that receives bad advice could seek better advice from a competitor in the future. But because ISS and Glass Lewis are essentially the only two proxy advisors, and they are both dedicated to ESG and DEI considerations over the representations they make to their customers, there is essentially no way for institutional investors to obtain unbiased proxy advice.

134.    The fact that Defendants have joined organizations that encourage, if not require, them to act in concert and offer a lower quality product that is infected with considerations unrelated to shareholder value only proves this fact.

135.    To name some non-exhaustive examples, both Defendants follow the UN PRI Principles and Reporting Requirements.[88] Likewise, both Defendants follow the "UK Stewardship Code," which requires signatories to "systematically

---

[86] Chong Shu, *The proxy advisory industry: Influencing and being influenced*, 154 J. FIN. ECON. 1, 2 (2024), https://perma.cc/QNH3-AE3H.
[87] *Id.*
[88] *How Glass Lewis Helps Investors Meet the UN PRI Principles and Reporting Requirements*, GLASS LEWIS (June 19, 2025), https://perma.cc/LVY3-YCCS; PRI Directory, Principles for Responsible Investment (last viewed Nov. 19, 2025) https://www.unpri.org/supporters (listing ISS as a member since 2014).

integrate stewardship and investment, including material environmental, social and governance issues, and climate change, to fulfil their responsibilities."[89]

136. Defendants 's products are also materially indistinguishable. Defendants' ESG recommendations are borderline identical in the most relevant respects. As cataloged above, both Defendants base their benchmark or presumptive recommendations on the same brand of ESG ideology. In particular, both Defendants advocate for racial, gender, and sexuality quotas on corporate boards and an extreme version of environmentalism, which mandates increased climate reporting and reduction in greenhouse gas emissions for all companies, regardless of financial effect. And both Defendants cloak and market their ESG ideology in the alleged management of "reputational risk," while considering risk from one extreme angle of the political spectrum.

137. Defendants offer this product despite ample evidence that demand exists for non-ESG proxy advice and significant evidence that ESG proxy advice is less effective than advice focused on traditional metrics of shareholder value which Defendants acknowledge internally but not publicly. For example, even according to ISS's own survey data, more than 40 percent of investors do not agree about "the importance of ethnic and/or racial diversity on corporate boards," or the proposition

---

[89] Glass, Lewis & Co., (@GlassLewis), X (Sep. 27, 2025 at 10:09 am ET), https://perma.cc/HDC9-GY2V (second quoting *The UK Stewardship Code 2020* at 15, ECGI, https://perma.cc/C273-HKVH).

that "boards should aim to reflect the company's customer base and the broader societies in which they operate by including directors drawn from racial and ethnic minority groups."[90]

**COUNT I**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, SEC. 501.204, FLA. STAT., DECEPTIVE ACTS AND STATEMENTS.**

138. The State repeats and incorporates by reference each allegation contained in paragraphs 1 through 137 as if fully set forth herein.

139. Defendants engage in trade or commerce in the State of Florida by selling their service of proxy advice to paying Florida clients, such as Raymond James, Office Depot, and GQG Partners. *See* § 501.203(8)-(9), FLA. STAT.

140. A "representation, omission, or practice" is deceptive under the FDUTPA if it "is likely to mislead consumers acting reasonably in the circumstances." *State v. Beach Blvd. Automotive, Inc.*, 139 So. 3d 380, 387 (Fla. 1st DCA 2014); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So.2d 773, 777 (Fla. 2003). "[U]nlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *State, Off. of Att'y Gen., Dep't of Legal Affs. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004).

---

[90] *ISS Proposed Benchmark Policy Changes for 2021*, ISS-FL-00172378, at -380.

141. Defendants have deceived Florida consumers through their statements, acts, practices, and material omissions. For example, Defendants claim that they seek to maximize long-term shareholder value, but many of their recommendations push policies that are not designed to maximize value at all, such as gender quotas or so-called ESG metrics. Likewise, Defendants claim that their DEI and ESG recommendations are backed by rigorous analysis. But their internal communications show that ideology, not data, was the driving force behind these recommendations. Defendants, put simply, claim to be neutral advisors while attempting to further an ideological agenda.

142. Defendants' statements, acts, and practices are likely to mislead a reasonable consumer under the circumstances. *See Beach Blvd. Automotive, Inc.*, 139 So.3d at 387. Defendants hold themselves out as neutral experts who consumers can trust to act in their best interest. It is therefore reasonable for consumers to believe that companies with multi-trillion-dollar client portfolios would tell the truth about how to maximize long-term shareholder value.

143. Defendants also omit information material to consumers, which Defendants have a duty to disclose. For example, Defendants routinely recommend that boards institute quotas along racial lines. Doing so carries significant legal risk. Despite the prospect of a significant damages award for engaging in blatant racial discrimination, Defendants recommended that shareholders vote against board

members based on the racial composition of their boards. Nor did Defendants disclose the material risk of consumer backlash against their political agenda.

144.    Defendants act willfully because they know or should have known that their actions were deceptive. Defendants knew or should have known that that there is no empirical consensus that the percentage of women and so-called non-binary individuals on a company's board did not increase long-term value. And they were also aware or should have been aware of the literature showing that ESG funds underperform the market. Defendants have been put on notice of their deceptive practices for several years yet continued to deceive consumers.[91]

145.    Defendants victimize senior citizens through their actions impacting Florida seniors' retirement accounts and pension funds.

## COUNT II
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, SEC. 501.204, FLA. STAT., UNFAIR ACTS AND PRACTICES.

146.    The State repeats and incorporates by reference the allegations in paragraphs 1 through 137 as if fully set forth herein.

147.    Defendants' unfair practices offend established public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *See PNR, Inc.,* 842 So.2d at 777. A Defendant need not mislead a

---

[91] GL_EMAIL-0156131; ISS-FL-00056605.

customer to engage in an unfair practice. *See Webber v. Bactes Imaging Sols., Inc.*, 295 So. 3d 841, 845 (Fla. 2d DCA 2020) ("Because we have already determined that Bactes's conduct constitutes an unfair act or practice under FDUTPA, *see* § 501.204(1), it is unnecessary for us to decide whether that conduct is also deceptive."). For example, a creditor can commit an unfair act by unduly harassing a debtor without deceiving him in any way. *See Schauer v. Gen. Motors Acceptance Corp.,* 819 So.2d 809, 812 (Fla. 4th DCA 2002) (explaining that a plaintiff stated a claim when he "alleged sufficient facts to show [Defendant] violated this Act by willfully harassing him and his family with respect to the collection of its debt.").

148.   Florida applies a three-part test for unfairness: "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1098 (Fla. 3d DCA 2014).

149.   The injury to Florida consumers caused by Defendants qualifies as unfair within FDUTPA. *See Porsche Cars N. Am.*, 140 So. 3d at 1098. It unethical and substantially injures customers when proxy advisors give advice based on ideological considerations instead of neutral advice based on financial analysis. Even if Defendants subjectively thought that clients should vote for liberal policy

41

positions, it was unethical to give that advice while knowing that it was unrelated or harmful to the long-term value of the companies. This fact is all the more true in a hyper-concentrated market, where consumers do not have the ability to shop around for the best advice.

150.    Defendants' unfair acts and practices have impacted millions of Floridians and billions of dollars belonging to them. The Florida Retirement System's pension plan alone has over $240 billion dollars invested and has relied on the advice of Defendants. Given the size of the pension plan and the importance of the votes that Defendants make recommendations on, it is at least "likely" that their faulty advice, even pretending it was not given maliciously, would result in a "substantial injury." *See id.*

151.    This harm is not outweighed by any countervailing benefits to consumers or competition that the Defendants' practices produce. Indeed, there is no benefit to proxy advisors promoting their own political goals over their financial well-being of their clients. The entire reason that proxy advisors are hired in the first place is because they are in a better place to determine how to promote long-term shareholder value.

152.    Likewise, this case does not involve an injury that consumers themselves could have reasonably avoided. It was reasonable for Florida consumers to rely on the promises of the two largest proxy advisors, even though it turned out

42

the advisors were seeking to further ideological policy preferences instead of the pecuniary interests of their customers.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs, respectfully requests that this Court:

1. Enter judgment in favor of the Attorney General and against Defendants;

2. Declare that Defendants' actions violate FDUTPA.

3. Temporarily and permanently enjoin Defendants to prevent future violations of FDUTPA.

4. Award civil penalties and attorneys' fees pursuant to FDUTPA.

5. Award actual damages pursuant to FDUTPA.

6. Order that Defendants pay court costs and all costs associated with distributing and executing on any restitution or judgment made by this Court; and

7. Grant any other such legal or equitable relief as justice permits.

[Signature block on next page]

Respectfully submitted,

Dated: May 8, 2026

STATE OF FLORIDA
JAMES UTHMEIER
ATTORNEY GENERAL

/s/ *David H. Thompson*
David H. Thompson
Peter A. Patterson*
Harold S. Reeves*
Bradley L. Larson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
hreeves@cooperkirk.com
blarson@cooperkirk.com

Ryan Newman
Chief Deputy Attorney General
Lizabeth A. Brady (FLB #457991)
Director, Antitrust Division
Timothy Fraser (FLB #957321)
Special Counsel
Office of the Attorney General
State of Florida
Department of Legal Affairs
PL-01 The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300

*Admitted pro hac vice*

*Counsel for Plaintiff*

44

45

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court and served on all counsel of record via the CM/ECF system on this 8th day of May, 2026.

Respectfully submitted,

/s/ *David H. Thompson*
David H. Thompson