**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

|  |  |
|---|---|
| OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS, <br><br> *Plaintiff*, <br><br> v. <br><br> INSTITUTIONAL SHAREHOLDER SERVICES INC.; GLASS LEWIS & CO. LLC., <br><br> *Defendants*. | Case No. 5:26-cv-00026-MW-MJF |

**PLAINTIFF'S CONSOLIDATED RESPONSE MEMORANDUM TO**
**DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

<u>**Page**</u>

TABLE OF AUTHORITIES......................................................................... iii

BACKGROUND .....................................................................................3

LEGAL STANDARD ............................................................................12

ARGUMENT ......................................................................................14

    I.    This Court Should Remand Without Deciding the Motions to
Dismiss. .........................................................................................14

    II.    This Court Has Personal Jurisdiction Over Both Defendants. .................18

        A.    Personal Jurisdiction Exists Under the Florida Long-Arm Statute.... 18

        B.    Personal Jurisdiction Exists Under the Due Process Clause...............23

            1.    The Two FDUTPA Counts Relate to the Defendants' Contacts with
Florida. .....................................................................................23

            2.    Defendants Purposefully Availed Themselves of Operating in
Florida. .....................................................................................26

            3.    Exercising Jurisdiction Would Comport with Traditional Notions
of Fair Play and Substantial Justice. .............................................29

    III.    Plaintiff Has Stated a Claim for Violations of FDUTPA. ......................31

        A.    Plaintiff Plausibly Alleges a Deceptive-Conduct Claim Under
FDUTPA. ................................................................................... 31

            1.    Defendants' "Context" Arguments Fail. ........................................35

            2.    Statements About "Shareholder Value" and "Rigorous Analysis"
Are Not Puffery. ..........................................................................38

            3.    Plaintiff's Amended Complaint Meets the Applicable Pleading and
Standard......................................................................................39

            4.    Plaintiff Adequately Alleges Defendant Conduct in Florida. ........41

B.     The Complaint Adequately Alleges Unfair Conduct Under FDUTPA. ......................................................................................43

    1.    The *Noerr-Pennington* Doctrine Does Not Apply. ........................45

CONCLUSION ...............................................................................................46

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*AcryliCon USA, LLC v. Silikal GmbH*, |
    985 F.3d 1350 (11th Cir. 2021)......................................................12, 13, 18

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988)......................................................................28, 45, 46

*Alpine View Co. LTD v. Atlas Copco AB*,
    205 F.3d 208 (5th Cir. 2000).................................................................15. 16

*Am. All. for Equal Opportunity v. Fearless Fund Mgmt., Inc.*,
    103 F.4th 765 (11th Cir. 2024).............................................................33, 34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................13

*Atlantis Marina & Yacht Club, Inc. v. R & R Holdings, Inc.*,
    766 So.2d 1163 (Fla. Dist. Ct. App. 2000) ....................................................19

*Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*,
    No. 10-23869-CIV, 2012 WL 1570057 (S.D. Fla. May 2, 2012)............42, 43

*Breland v. Levada VF Five, LLC*,
    No. 14–158–CG–C, 2015 WL 225394 (S.D. Sla. 2016)...............................28

*Brooks v. Blue Cross Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997)....................................................37

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)..............................................................16, 25, 26, 27

*Calderon v. Sixt Rent a Car, LLC*,
    No. 19-cv-62408, 2020 WL 700381 (S.D. Fla. Feb. 12, 2020)...............35, 36

*Cantor Fitzgerald, L.P. v. Peaslee*,
    88 F.3d 152 (2d Cir. 1996)...........................................................15

*Chaparro v. Carnival Corp.*,
    693 F.3d 1333 (11th Cir. 2012)....................................................13

*Del Valle v. Trivago GMBH*,
    56 F.4th 1265 (11th Cir. 2022)......................................................23, 26, 29

iii

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*,
    593 F.3d 1249 (11th Cir. 2010)..............................................13, 23, 24, 25, 27

*Domino's Pizza, Inc. v. McDonald*,
    546 U.S. 470 (2006)..........................................................................33

*ECB USA, Inc. v. Savencia Cheese USA, LLC*,
    148 F.4th 1332 (11th Cir. 2025)....................................................18

*Ervast v. Flexible Prods. Co.*,
    346 F.3d 1007 (11th Cir. 2003)....................................................15

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*,
    752 So. 2d 582 (Fla. 2000) ..........................................................22

*Fineman v. Ferragamo USA Inc.*,
    672 F. Supp. 3d 1302 (S.D. Fla. 2023) ........................................38

*Future Tech. Today, Inc. v. OSF Healthcare Sys.*,
    218 F.3d 1247 (11th Cir. 2000)....................................................19

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006)..............................................39, 40

*Hetrick v. Ideal Image Dev. Corp.*,
    372 F. App'x 985 (11th Cir. 2010) ...............................................34

*Hetrick v. Ideal Image Dev. Corp.*,
    372 F. App'x 985 (11th Cir. 2010) .........................................33, 34

*Hicks v. Bombardier Recreational Prods. Inc.*,
    684 F. Supp. 3d 1223 (S.D. Fla. 2023) ........................................22

*Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*,
    421 F.3d 1162 (11th Cir. 2005)..........................................20, 21, 22

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
    706 F. Supp. 3d 1363 (S.D. Fla. 2020) ..................................12, 13

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)................................................................18, 23

*Internet Sols. Corp. v. Marshall*,
    39 So.3d 1201 (Fla. 2010) ...........................................................22

*Karnas v. Cuban*,
    No. 22-cv-22538, 2025 WL 3759241 (S.D. Fla. Dec. 30, 2025) .................27

iv

*Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of Treasury*,
   773 F.3d 243 (11th Cir. 2014)......................................................................13

*Lane v. Champion Intern. Corp.*,
   827 F. Supp. 701 (S.D. Ala. 1993)...............................................................17

*Louis Vuitton Malletier, S.A. v. Mosseri*,
   736 F.3d 1339 (11th Cir. 2013).....................................................................22

*Marty v. Anheuser-Busch Cos., LLC*,
   43 F. Supp. 3d 1333 (S.D. Fla. 2014) ..........................................36, 37, 38, 39

*Millenium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*,
   761 So. 2d 1256 (Fla. Dist. Ct. App. 2000)....................................................42

*Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*,
   657 F. Supp. 2d 1279 (M.D. Fla. 2009)..........................................................37

*Nordt v. Colina Ins. Ltd.*,
   No. 17-21226-CIV, 2017 WL 4225550 (S.D. Fla. Sept. 22, 2017).........19, 20

*Off. of Att'y Gen., Dept. of Legal Affairs v. Wyndham Int'l, Inc.*,
   869 So. 2d 592 (Fla. Dist. Ct. App. 2004)....................................................40

*Phillips v. Legacy Cabinets,*
   87 F.4th 13131 (11th Cir. 2023)....................................................................33

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
   842 So. 2d 773 (Fla. 2003) .................................................31, 32, 41, 42, 43

*Pop v. LuliFama.com LLC*,
   145 F.4th 1285 (11th Cir. 2025)....................................................................40

*Porsche Cars N. Am., Inc. v. Diamond*,
   140 So. 3d 1090 (Fla. Dist. Ct. App. 2014)..............................................43, 44

*Ranbaxy Lab'ys Inc. v. First Databank, Inc.*,
   No. 3:13-cv-859, 2014 WL 982742 (M.D. Fla. Mar. 12, 2014)........29, 30, 31

*RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*,
   579 F. App'x 779 (11th Cir. 2014)................................................................19

*Ruhrgas AG v. Marathon Oil Co.*,
   526 U.S. 574 (1999)......................................................................15, 16, 17

*S. Broward Hosp. Dist. v. ELAP Servs., LLC*,
   No. 20-CV-61007, 2020 WL 7074645 (S.D. Fla. Dec. 3, 2020)...................35

v

*SEC v. Carrillo*,
    115 F.3d 1540 (11th Cir. 1997) ......................................................................26

*Slaihem v. Sea Tow Bahamas Ltd.*,
    148 F. Supp. 2d 1343 (S.D. Fla. 2001) ...................................................19, 20

*SmileDirectClub, LLC v. Battle*,
    4 F.4th 1274 (11th Cir. 2021).................................................................29, 45

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery,
    LLC*, 278 F. Supp. 3d 1307 (S.D. Fla. 2017)..................................................35

*Stonepeak Partners, LP v. Tall Tower Cap., LLC*,
    231 So. 3d 548 (Fla. Dist. Ct. App. 2017).....................................................21

*Trans Am Worldwide v. JP Superior Sols., LLC*,
    No. 4:17cv560, 2018 WL 3090394 (N.D. Fla. Apr. 30, 2018)................19, 20

*Vokes v. Arthur Murray, Inc.*,
    212 So. 2d 906 (Fla. Dist. Ct. App. 1968).....................................................39

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008).....................................................................38, 39

## Statutes

42 U.S.C. § 1981 ................................................................................................33

FLA. STAT. ANN.
    § 48.193(1)(a)(1)...............................................................18, 19, 20, 21
    § 48.193(1)(a)(2).............................................................................21
    § 501.204(1)...................................................................................31

## INTRODUCTION

Glass Lewis & Co. and Institutional Shareholder Services ("Defendants") enter long-term contracts to sell advice to institutional investors, including those in Florida, about how to vote their shares. Proxy advice is in high demand, and Defendants are by far the two largest proxy advisors in the country. As part of their strategy to recruit and retain clients, both firms claim that their recommendations are disinterested, analytically driven, and focused on long-term shareholder value.

Despite these claims, both Glass Lewis and ISS inject their own political agendas into the advice they sell, regardless of their clients' pecuniary interests. Defendants, for example, recommend voting against a candidate for the board of directors if the company's board lacks a sufficient number of female, nonbinary, or racial-minority directors. Defendants also demand that companies achieve the targets of the Paris Climate Accords and recommend against directors if the board fails to set sufficiently aggressive emission-reduction goals. They make these recommendations not because they are concerned about how their clients benefit financially. Even the most successful companies in the world, such as Tesla and Berkshire Hathaway, have incurred negative vote recommendations based on these nonpecuniary criteria.

Defendants have no legal right to mislead their clients about their true goals. Their statements thus violated the Florida Deceptive and Unfair Trade Practices Act

1

(FDUTPA) in two different ways. First, they have made a variety of misleading statements. They state that their recommendations are designed to promote long-term shareholder value, but the evidence shows their recommendations often ignore actual value metrics in favor of Defendants' own political preferences. They state that their recommendations are backed by rigorous analytics and research, but the evidence shows that ideology, not analytics, is the driving force behind these recommendations. And while they state that their recommendations ensure regulatory compliance, they push their clients to support legally suspect gender and race quotas for corporate boards. Second, they have exclusively sold products that neglect maximizing shareholder value and thus hurt their consumers by misleading them.

Defendants have moved to dismiss primarily on two grounds. First, they contend that Florida courts lack personal jurisdiction over them. But they have substantial and continuing business connections in Florida related to their actions in this case. Defendants have entered into contracts that create continuing obligations with Florida-based entities, agreed to follow Florida law with respect to such contracts, constantly sent communications into Florida about their proxy advice pursuant to those contracts, and even argue that their activities counted as "petitioning" the Florida government. ISS Br. at 32. Those contacts are plainly sufficient to establish specific jurisdiction under Florida's long-arm statute and the

2

Constitution's Due Process Clause. Defendants' second basis for dismissal is that their statements are not actionable under FDUTPA. But a reasonable person could easily conclude that their statements and omissions were misleading, as courts have concluded when confronted with similar motion to dismiss allegations under FDUTPA. At bottom, Defendants ask this Court to make inferences in their favor and prematurely rule on issues more appropriate for resolution by a finder of fact.

## BACKGROUND

ISS and Glass Lewis are, by far, the two largest proxy advisors in the world. Am. Compl. ¶ 2. Although often working in the shadows, proxy advisors play a significant role in the global financial system. Institutional investors—BlackRock, Vanguard, State Street, etc.—hold large stakes in every publicly traded company, but they do not have the time or resources to independently assess how to vote their shares. *Id.* ¶ 1. These investors, along with pension funds and similar entities, pay proxy advisors like Glass Lewis and ISS to recommend how they should vote.

The market served by the proxy-advice industry is massive. The investors that Glass Lewis advises hold over $40 trillion dollars in assets and include "the majority of the world's largest public pension funds, asset managers and mutual funds." *Id.* ¶ 36. ISS does not advertise the value of the assets under management of its clients, but the number is likely in the tens of trillions. *Cf. Id.* ¶ 37. Unsurprisingly, Defendants exert an unrivalled influence on American corporate culture, as the vast

3

majority of entities that actually vote shares rely on Glass Lewis and ISS to inform their voting. *Id.* Because those entities are voting the shares on behalf of their true owners, the American people, Defendants exercise significant control over the lives of everyday Americans, including Floridians. *Id.* ¶ 41.

Defendants offer a variety of products that money-managers, pension funds, and other large-scale investors can select to help inform how to vote their shares. Defendants' basic product is called a "Benchmark" Policy. Defs.' Notice of Removal ¶ 7; Am. Compl. ¶¶ 50–51, 63. The Benchmark Policy gives the standard "house" advice of Glass Lewis and ISS, respectively. *See* Am. Compl. ¶¶ 50–51, 63. Subscribers to the Benchmark Policies receive recommendations in accordance with that policy on votes to retain or replace corporate directors and whether to vote for or against shareholder proposals. Defendants claim that the primary goal of the Benchmark Policies is to promote long-term "shareholder value." *Id.* ¶¶ 5, 71, 73. ISS claims its benchmark policy is backed by "rigorous" analysis, *id.* ¶ 89, and Glass Lewis claims its benchmark policy is backed by "in-depth research," *id.* ¶ 94.

Defendants also offer so-called "[s]pecialty" policies. Defs.' Notice of Removal ¶ 5. These policies purport to balance shareholder value while also seeking to accomplish some other non-pecuniary goal. For instance, ISS offers policies based on the idea of "socially responsible investing," Compl. ¶ 87, which purports to balance maximizing shareholder value and upholding certain vague social goals.

Other specialized policies include a Catholic policy, a Taft-Hartley policy, and a Public Pension policy. *See, e.g.*, Compl. ¶ 61; Defs.' Notice of Removal ¶ 8. Defendants may also offer "specialized" policies that are custom-tailored to a specific investor.

The way that Defendants describe these offerings misleads consumers, including their clients in Florida. Instead of seeking to maximize long-term shareholder value under the Benchmark Plans, Defendants inject their own political preferences that are either irrelevant to shareholder value or antithetical to it. Am. Compl. ¶¶ 77–81, 94. Both Defendants recommend that their clients vote against board members if the board was insufficiently diverse in terms of race and gender. *See* Compl. ¶¶ 50, 66, 115. Glass Lewis's Benchmark Policy, for example, "will generally recommend against the chair of the nominating committee of a board with fewer than one director from an underrepresented community on the board at companies within the Russell 1000 index." Am. Compl. ¶ 47 (quoting *2025 Benchmark Policy Guidelines* at 41, GLASS LEWIS, https://perma.cc/9JFW-HKEM.). Glass Lewis defines "underrepresented community" not on the basis of business or life experience but on the basis of crude racial and sexual metrics. In its own words, "[w]e define 'underrepresented community director' as an individual who self-identifies as Black, African American, North African, Middle Eastern, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaskan

5

Native, or who self-identifies as a member of the LGBTQIA+ community." *Id.* ¶ 48. Glass Lewis's Benchmark Policy also recommends voting against "the governance committee chair of a company in the Russell 1000 index" if the company "fails to provide explicit disclosure concerning the board's role in overseeing [climate change] issues." *Id.* ¶ 51. These recommendations, contrary to the assertions of Glass Lewis, do not increase shareholder value. *Id.* ¶¶ 72–76.

Glass Lewis's threats to recommend voting against board members when companies fail to live up to their legally suspect racial and gender quotas have not been idle. For instance, Glass Lewis recommended voting against board members at "Berkshire Hathaway Inc. because of our concerns regarding its lack of acknowledgment of climate-related risks and its preparedness for such risks." *Id.* ¶ 55. The fact that Berkshire Hathaway is one of the most successful companies on the planet over the past decade made no difference to Glass Lewis's recommendation. Even more aggressively, Glass Lewis sought to force Tesla, Inc., another one of the most successful companies in the world, to "establish a public policy committee to oversee its policies including human rights, environment, domestic governmental regulations, foreign affairs and international relations affecting its business" based on vague concerns about so-called "reputational" risks. *Id.* ¶ 56. To be sure, Glass Lewis's recommendations were not limited to a subset of companies where race, gender, or environmental issues were of a particular salience.

Its gender and race quotas for boards applied to all companies in the relevant index, and "[g]iven the exceptionally broad impacts of a changing climate on companies, the economy, and society in general, [Glass Lewis] view[s] climate risk as a material risk for *all companies*." *Id.* ¶ 57.

ISS adopted similar, if not more extreme, DEI and ESG criteria for its voting recommendations. For example, its Benchmark Policy recommends that clients "[g]enerally vote against" retention of board members at "companies where there are no women on the company's board," regardless of how well the company is performing financially. *Id.* ¶ 63(a). ISS's Benchmark Policy does not explain why a lack of women on a board presents a material financial risk for all companies. Nor does ISS's Benchmark Policy explain why it is inappropriate for a board to lack women but appropriate for a board to lack men. And "[f]or companies in the Russell 3000 or S&P 1500 indices," ISS's Benchmark Policy "generally" recommends that clients "vote against" retention of board members "where the board has no apparent racially or ethnically diverse members." *Id.* ¶ 63(b). The policy does not explain why a lack of "apparent[ly] racially or ethnically diverse members" of a board presents a material financial risk. *Id.* Nor does it grapple with the legal issues surrounding explicit racial discrimination in hiring.

Much like Glass Lewis, ISS also requires compliance with controversial ESG criteria for boards to avoid adverse voting recommendations with respect to director

retention and executive compensation. For companies that ISS deemed "significant greenhouse gas (GHG) emitters," ISS recommended that its clients "generally vote against" board members "in cases where ISS determines that the company is not taking the minimum steps needed to understand, assess, and mitigate risks related to climate change." *Id.* ¶ 63(c).

None of these criteria have anything to do with increasing shareholder value. *See id.* ¶ 72–76. Defendants justified their gender and racial quotas on the ground that diversity increases company performance. *Id.* ¶ 100. But they possessed no valid studies that showed diversity was a *causal* factor in increasing shareholder value, and the very research they cited showed that quotas decreased shareholder value. *Id.* Defendants gave the game away by only prioritizing gender and racial diversity, not diversity of experience. If Defendants believed that diversity increased shareholder value, they would have cared about directors' backgrounds and experiences, not their skin colors and sex. Likewise, Defendants pushed for emission reductions without regard to the financial harm those reductions would have on the companies. *Id.* ¶ 116. For instance, Glass Lewis sought to require all companies to set emission-reduction targets, despite the fact that reducing emissions is often against the best interest of companies, such for example fossil-fuel producers. *Id.* ¶¶ 54–55.

Despite their claims of lack of jurisdiction by this Court, Defendants do significant business in Florida and thus their misstatements, unsurprisingly, cause

significant harm in Florida. Most relevantly, Defendants have contracted to "provide their commercial services" to Florida-based entities with proxy advice for decades. *Id.* ¶ 15; Decl. of Michael McCauley ¶¶ 15, 19. One such Florida-based entity is the Florida State Board of Administration (SBA). The SBA is the Florida government entity that manages the Florida Retirement System, which had 659,333 active members and provided retirement-income benefits to 459,428 retirees in 2024. Am. Compl. ¶¶ 16–17. As part of its management operations, the SBA votes the shares of its members in corporate-board elections and other matters. Decl. of Michael McCauley ¶ 9.

To help facilitate its voting processes, the Florida SBA has employed both ISS and Glass Lewis since 1988 and 2003, respectively, to advise it with respect to voting its many shares. Am. Compl. ¶ 15; Decl. of Michael McCauley ¶¶ 15, 19. The contracts that Defendants sign with SBA are generally for a term of multiple years and are either renewable or automatically renewed. *See* ECF No. 45-2; Decl. of Michael McCauley ¶¶ 10, 15, 19; Ex. A at 1-2; Ex. E at 1. For instance, the contract with SBA that Glass Lewis attached to its motion to dismiss "expire[d] sixty (60) months after the Effective Date" of the contract and gave SBA "the right to renew th[e] Agreement for two (2) successive additional terms." ECF No. 45-2. SBA signed its current "Master Services Agreement" with ISS in 2004. The Agreement "automatically renew[s] for successive one-year renewal terms unless either party

9

notifies the other at least thirty (30) days before expiration that it will not renew."

Exhibit E at 1. Although the Master Services Agreement automatically renews on

an annual basis, SBA and ISS routinely amend the contract to renew with additional

specified criteria. Decl. of Michael McCauley ¶ 6. The 2024-2029 Addendum, for

instance, specifies that SBA is receiving the ISS "benchmark policy" for both the

United States and global markets. *See* Ex. F at 3.

Defendants also agreed to follow certain Florida laws when dealing with

Florida-based entities. SBA's contracts with each Defendant require Glass Lewis

and ISS to "register with and use the E-Verify system to verify the employment

eligibility of newly hired employees performing services within the United

States . . . *in accordance with Section 448.095, Florida Statutes*." *Id.* at 5. (emphasis

added); *see also* Ex. B at 3 ("Glass Lewis agrees to comply with[] Section 448.095,

Florida Statutes"). Similarly, both Defendants agreed that their contracts were

"subject to the Florida Public Records Law, Chapter 119, Florida Statutes." ECF No.

45-2. Pursuant to that law, "Glass Lewis" agreed that it "shall . . . [k]eep and

maintain public records required by the SBA in order to perform the services under

this Agreement" and "[u]pon request from the SBA' custodian of public records,

provide the SBA with a copy of the requested records or allow the records to be

inspected or copied within a reasonable time." *Id.* at 4.

10

In addition to the contracts whereby Defendants agreed to follow Florida law, Defendants also routinely communicate with their Florida-based clients through emails, telephone calls, and video calls. As the declaration of SBA's Head of Investment Programs & Governance Mike McMauley explains, both Glass Lewis and ISS have sent hundreds of "substantive" emails to employees in the Florida SBA's corporate-governance team just within the past few months. Decl. of Michael McCauley ¶¶ 18, 22. Many of these emails discuss voting issues related to ESG and DEI. *Id.* And many more are specific communications between Defendants and SBA about how to vote and how to operate the Glass Lewis and ISS platforms that SBA uses. *Id.* Glass Lewis and ISS also explicitly solicit the advice of the SBA to improve their products. Both Defendants send SBA unsolicited surveys that ask SBA to review their recommendations and suggest changes in the future. *Id.* ¶¶ 23–26. After the results of the surveys are in, both Glass Lewis and ISS will circulate the policies at issue in this case, including their Benchmark Policies, to SBA.

Given that Defendants have misled and otherwise harmed their Florida clients, including the Florida SBA, the Florida Attorney General opened an investigation. As part of that investigation, he issued Civil Investigative Demands to turn over documents. After reviewing the documents, the Attorney General filed a complaint in the Fourteenth Circuit in Gulf County, Florida. *See* ECF No. 1-1. The complaint alleged two counts under the Florida Deceptive and Unfair Trade Practices Act and

11

one count under the Florida Antitrust Act. *Id.* ¶ 8. For relief, he sought civil monetary penalties, actual damages, and an injunction preventing future violations of the law. *Id.* ¶ 10.

After the complaint was served, ISS removed this case to federal court, with the consent of Glass Lewis. The Attorney General amended the complaint as a right to remove the sole count ISS claimed justified removal in its notice of removal. *See* Am. Compl. He then moved to remand the case back to state court. ECF No. 41. Defendants opposed remand, and the motion to remand is fully briefed and pending with this Court. ECF Nos. 41, 47, 53, 57. In the meantime, Defendants both moved to dismiss the complaint. ECF Nos. 45, 46. In response to the motions to dismiss, the Attorney General moved for leave to serve jurisdictional discovery. ECF No. 56. That motion is still pending, and the Attorney General reserves the right to supplement this response if he is permitted to take such discovery.

## LEGAL STANDARD

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a "prima facie" showing of jurisdiction. *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021). When a defendant's arguments about personal jurisdiction include a factual challenge, the court must consider "the complaint and affidavits" submitted by both parties to determine if the Plaintiff has made such a showing. *Id.* "If the defendant includes affidavits or other evidence in

12

support of the 12(b)(2) motion," then "the question of personal jurisdiction is resolved by reference to facts outside the four corners of the complaint." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 706 F. Supp. 3d 1363, 1366 (S.D. Fla. 2020).

When applying this prima facie standard, the Court must both accept the allegations in the Complaint as true and "consider[ ] all affidavit evidence proffered by the parties." *AcryliCon USA*, 985 F.3d at 1364. "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (citation omitted).

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted); *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When a complaint contains a "general allegations," the Court assumes that the allegation also includes the necessary allegations to make that allegation true. *Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of Treasury*, 773

13

F.3d 243, 245 (11th Cir. 2014) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992)).

## ARGUMENT

### I.   This Court Should Remand Without Deciding the Motions to Dismiss.

As explained in Plaintiff's motion to remand, this Court lacks subject-matter jurisdiction over this case. *See* ECF No. 41. The one count in the original complaint that Defendants based their removal on has been eliminated from the case. And Defendants affirmatively waived the right to rely on any other allegedly federal element of the complaint by arguing for "supplemental jurisdiction" over the other two counts. Defs.' Notice of Removal ¶ 51. Even if Defendants had not waived the ability to argue in favor of federal-question jurisdiction over the FDUTPA counts, their claim of jurisdiction under the *Noerr-Pennington* doctrine is wrong and has never been accepted by a federal court.

Defendants ask the Court to ignore the already-ripe motion to remand and rule on their motions to dismiss instead. This request is in tension, at a minimum, with their prior position in this case. When all parties jointly moved to establish a briefing schedule for the motions to dismiss, they notified the Court that they would seek to have the remand issue briefed first to give "the Court the opportunity to address the issue of whether the Complaint was properly removed to federal court . . . in advance of a motion to dismiss." ECF No. 25 at 2.

14

Defendants also ask this Court to ignore basic principles of federalism by failing to decide subject-matter jurisdiction first. Although the Constitution does not necessarily prohibit a federal court from deciding personal jurisdiction before deciding subject-matter jurisdiction, the Supreme Court has made clear that a district court abuses its discretion if it decides personal jurisdiction first in all but the narrowest of circumstances. "[B]oth expedition and sensitivity to state courts' coequal stature should impel the federal court[s] to dispose of" subject-matter jurisdiction "first." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587–88 (1999); *Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 155 (2d Cir. 1996); *Alpine View Co. LTD v. Atlas Copco AB*, 205 F.3d 208, 213 (5th Cir. 2000) ("We read the *Ruhrgas AG* Court's opinion to direct lower courts facing multiple grounds for dismissal to consider the complexity of subject-matter jurisdiction issues raised by the case, as well as concerns of federalism, and of judicial economy and restraint in determining whether to dismiss claims due to a lack of personal jurisdiction before considering challenges to its subject-matter jurisdiction.").

This case is a prime example of one where subject-matter jurisdiction should come before personal jurisdiction under *Ruhrgas*. 526 U.S. at 587–88. Dispositively, the question of subject-matter jurisdiction is not difficult. *Id.* Eleventh Circuit precedent is clear that a party can waive arguments in favor of subject-matter jurisdiction, *Ervast v. Flexible Prods. Co.*, 346 F.3d 1007, 1012 n.4 (11th Cir. 2003),

15

and Defendants did so by invoking supplemental jurisdiction over the two-state law counts now remaining in the case in their notice of removal. Additionally, no court has ever accepted the argument that the *Noerr-Pennington* doctrine creates a federal question on the face of a complaint alleging violations of state law. Because the motion to remand is plainly meritorious, this Court would "abuse its discretion" if it did anything but remand. *Ruhrgas AG*, 526 U.S. at 587–88.

Even if the subject-matter-jurisdiction question were difficult, the Supreme Court has explained that a lower federal court can only decide personal jurisdiction before subject-matter jurisdiction if the former presents an easy case in favor of the defendant. *Id.* If anything, personal jurisdiction plainly favors the Plaintiff. Among other contacts, Defendants have entered into significant, long-term contracts with Florida-based entities that create continuing obligations for both parties and require Defendants to follow Florida law. ECF No. 45-2; Ex. A, E (master contracts with each Defendant). That evidence alone is sufficient to establish personal jurisdiction under the Supreme Court's decision in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).

The other factors that courts consider when determining the jurisdictional-sequencing issue confirm that subject-matter jurisdiction must come first. As the Supreme Court has explained, a "State's dignitary interest bears consideration when a district court" decides whether to address subject-matter or personal jurisdiction

16

first. *Ruhrgas AG*, 526 U.S. at 586; *see Alpine View Co. LTD*, 205 F.3d at 213 (accounting for "federalism" concerns). Florida, as a sovereign, has an important interest in not having the courts of a different sovereign determine whether Defendants have sufficient contacts with Florida to establish personal jurisdiction. It is thus unlike the traditional litigant who seeks to vindicate only his private interest in state court.

"[J]udicial economy, fairness, and equity" also favor deciding subject-matter jurisdiction first. *Lane v. Champion Intern. Corp.*, 827 F. Supp. 701, 704–05 (S.D. Ala. 1993). Given the weakness of Defendants' removal arguments, the Court could draft a "a swift and nonreviewable remand order" that immediately sends this case back to where it belongs. *Ruhrgas AG*, 526 U.S. at 587. Ruling on personal jurisdiction, however, would require the court to dig into competing declarations, various contracts, and the intricacies of Florida caselaw concerning its long-arm statute. Moreover, the motion to remand was ripe before the motions to dismiss will be ripe; there is no reason to let the remand motion sit on a shelf while the motions to dismiss are still being briefed.

As for fairness and equitable considerations, *Lane*, 827 F. Supp. at 704–05, the parties agreed in their submission to the Court that the goal of the briefing schedule was to have the Court decide the remand issue before the personal-jurisdiction issue, *see* ECF No. 25 at 2. Given that the parties negotiated the briefing

17

schedule with the goal of allowing this Court to decide the removal issue first, it would make little sense to decide the personal-jurisdiction issue first.

## II.   This Court Has Personal Jurisdiction Over Both Defendants.

If this Court reaches the motions to dismiss for lack of personal jurisdiction, it should deny them. Personal jurisdiction exists if the state's long-arm statute covers the defendant and the application of the long-arm statute comports with the Fourteenth Amendment's limits on personal jurisdiction. *See ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332, 1340 (11th Cir. 2025); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). When a Defendant's motion to dismiss under Rule 12(b)(2) includes a factual challenge to jurisdiction, the Court must consider both the allegations in "the complaint and affidavits" submitted by both parties.[1] *AcryliCon USA, LLC*, 985 F.3d at 1364 ("The court accepts as true all unchallenged facts in the plaintiff's complaint, and then considers all affidavit evidence proffered by the parties.").

### A. Personal Jurisdiction Exists Under the Florida Long-Arm Statute.

Florida's long-arm statute sets out multiple avenues to establish jurisdiction

---

[1] Although this Court must consider both the allegations in "the complaint and affidavits" submitted by the plaintiff to determine if the plaintiff has met his "prima facie standard" to show personal jurisdiction, *AcryliCon USA, LLC*, 985 F.3d at 1364, Plaintiff has moved to amend the complaint to add allegations consistent with the declaration of Michael McCauley and accompanying evidence. Even if the Court only considers the complaint, personal jurisdiction still exists.

18

over a nonresident defendant. Two are relevant in this case. First, an out-of-state entity will fall within Florida's long-arm statute if that entity is "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state." FLA. STAT. ANN. § 48.193(1)(a)(1) (West 2016). "Florida courts have recognized that a 'business venture'" for the purposes of Florida's long-arm statute "'can consist of a single project or transaction.'" *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 F. App'x 779, 785 (11th Cir. 2014) (quoting *Atlantis Marina & Yacht Club, Inc. v. R & R Holdings, Inc.*, 766 So.2d 1163, 1165 (Fla. Dist. Ct. App. 2000)); *Atlantis Marina & Yacht Club, Inc.*, 766 So.2d at 1165 (collecting cases); *see Nordt v. Colina Ins. Ltd.*, No. 17-21226-CIV, 2017 WL 4225550, at *4 (S.D. Fla. Sept. 22, 2017); *Trans Am Worldwide v. JP Superior Sols., LLC*, No. 4:17cv560, 2018 WL 3090394, at *2 (N.D. Fla. Apr. 30, 2018) (Walker, J.).

Defendants' activities clearly demonstrate that both carried on a "business venture" in Florida that gave rise to this lawsuit. FLA. STAT. ANN. § 48.193(1)(a)(1) (West 2016). Defendants "engage in trade or commerce in the State of Florida by selling their service of proxy advice to paying Florida clients." Am. Compl. ¶ 119. They have done so for many decades, and have been paid over $1,000,000 each over the past five years, Decl. of Michael McCauley ¶¶ 15, 19, in "pecuniary benefit" from the Florida SBA alone, *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam). Defendants even contend that the

19

actions they took leading to the filing of this enforcement action constituted petitioning the Florida government. ISS Br. at 32. The relationship between Defendants and SBA is certainly "more than incidental." *Slaihem v. Sea Tow Bahamas Ltd.*, 148 F. Supp. 2d 1343, 1350 (S.D. Fla. 2001) (quotation marks omitted). And it certainly involved "continued activity," as the contractual relationships have existed for more than two decades and have been continuously renewed by the parties. *Trans Am Worldwide*, 2018 WL 3090394, at *2.

Florida courts have applied Florida's long-arm statutes in circumstances that involved far fewer connections to the State then in this case. For example, a Florida court upheld jurisdiction under the long-arm statute when an insurer paid "claims for medical treatment" in Florida even though it did "not issue policies in Florida or cover Florida residents." *Nordt*, 2017 WL 4225550, at *4. Here, not only do Defendants directly interact with Florida entities, but they have also directly derived millions of dollars over a long-term business relationship with such entities. In the plainest of terms, contracting with Florida businesses for decades constitutes a "business venture" within Florida. FLA. STAT. ANN. § 48.193(1)(a)(1) (West 2016).

Defendants counter this textual, well-supported, and common-sense conclusion by pointing to a multi-part test that courts sometimes apply when determining whether an entity is operating "a business" in Florida. *Id.*; *see* ISS Br. at 9-10; Glass Lewis Br. at 15. There is no doubt that courts *may* consider "(1) the

20

presence and operation of offices in Florida; (2) the possession and maintenance of a license to do business in Florida; (3) the number of Florida clients served; (4) the percentage of overall revenue gleaned from Florida clients; and (5) a defendant's marketing and advertising in Florida." *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162 (11th Cir. 2005). These factors can be a useful benchmark, but they are not necessary or exhaustive. Indeed, they are generally inapplicable when the allegation is that the defendant engaged in a specific "business venture," as opposed to running "a business" in Florida. FLA. STAT. ANN. § 48.193(1)(a)(1) (West 2016). This Court, for example, has concluded that "Plaintiff's cause of action arises from Defendant's business venture in Florida" without ever mentioning these factors. *Trans Am Worldwide*, 2018 WL 3090394, at *3. Even the cases that Defendants cite agree that "a single transaction for profit can constitute engaging in a business venture" and distinguished that test from the five factors described above. *Stonepeak Partners, LP v. Tall Tower Cap., LLC*, 231 So. 3d 548, 556 (Fla. Dist. Ct. App. 2017). Here, it bears repeating, Defendants have engaged in repeated transactions across decades, consistently renewing their contractual agreements to receive hundreds of thousands of dollars per year for the provision of their proxy advice in Florida.

Second, Defendants are also subject to jurisdiction under Florida's long-arm statute because they have committed "tortious act[s] within" Florida. FLA. STAT.

21

ANN. § 48.193(1)(a)(2) (West 2016). "Florida courts construing" the tortious-acts "provision have noted that the alleged tortfeasor's 'physical presence [in Florida] is not required.'" *Horizon Aggressive Growth, L.P.*, 421 F.3d at 1168 (quoting *Wendt v. Horowitz,* 822 So.2d 1252, 1260 (Fla. 2002)). "Florida's long-arm statute 'permits jurisdiction over the nonresident defendant who commits a tort outside of the state that causes injury inside the state.'" *Hicks v. Bombardier Recreational Prods. Inc.*, 684 F. Supp. 3d 1223, 1237 (S.D. Fla. 2023) (quoting *Licciardello v. Lovelady*, 244 F.3d 1280, 1283 (11th Cir. 2008)); *see Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013) ("[U]nder Florida law, a nonresident defendant commits a tortious act within Florida when he commits an act *outside* the state that causes injury within Florida." (citation omitted)); *Internet Sols. Corp. v. Marshall*, 39 So.3d 1201 (Fla. 2010) (same).

Here, Defendants committed torts that caused injury within Florida. The Supreme Court of Florida itself has explained that violating FDUTPA constitutes a "tortious act" within the meaning of the Florida long-arm statute, *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 586 (Fla. 2000), and thus Defendants have brought themselves within Florida's jurisdiction. It does not matter that Defendants are nationwide businesses that have likely violated a myriad of state consumer-protection laws. There is no immunity from Florida's jurisdiction just because a defendant sought to "bilk consumers throughout the United States" out of

22

their money. *Id.*

### B. Personal Jurisdiction Exists Under the Due Process Clause.

To satisfy the Due Process Clause's personal-jurisdiction requirements, an out-of-state defendant must have established "minimum contacts" with the relevant state. *Int'l Shoe Co.*, 326 U.S. at 316. An out-of-state defendant has minimum contacts with the forum when "(1) the plaintiff's claims 'arise out of or relate to' one of the defendant's contacts with the forum state; (2) the nonresident defendant 'purposefully availed' itself of the privilege of conducting activities within the forum state; and (3) the exercise of personal jurisdiction is in accordance with traditional notions of 'fair play and substantial justice.'" *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022) (cleaned up). Generally, the personal-jurisdiction requirement of the Fourteenth Amendment "is satisfied if the defendant has purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Diamond Crystal Brands, Inc.*, 593 F.3d at 1267 (quoting *Burger King Corp.*, 471 U.S. at 472–73). The purpose of the Due Process Clause's restriction on personal jurisdiction is to ensure that parties can "reasonably anticipate being haled into court." *Id.* (quoting *Burger King Corp.*, 471 U.S. at 474)

### 1. The Two FDUTPA Counts Relate to the Defendants' Contacts with Florida.

As the complaint and declaration of Michael McCauley explain, this lawsuit

23

arises out of Defendants' substantial and consistent contacts with Florida. Each Defendant has multiple contracts with Florida-based entities, including the Florida SBA. In the simplest terms, this case is about Defendants "selling their service of proxy advice," which Florida contends is misleading, "to paying Florida clients." Am. Compl. ¶ 119.

Even if that were not enough, there are many more contacts between Defendants and the State of Florida. The best examples, once again, come from Defendants' relationship with SBA. For example, Defendants are in routine communication with SBA's governance team. Decl. of Michael McCauley ¶¶ 10, 13, 17, 18, 19, 21, 22. These communications include both individualized messages to members of the SBA's governance team about "DEI and ESG proposals" and mass emails promoting Defendants' products and advice. *Id.* Most relevantly, these communications include requests for input from SBA about their policies, including the policies that include the statements that Florida asserts are misleading. *Id.* The Eleventh Circuit has consistently found personal jurisdiction to exist when the parties enter into a contract between a Florida-based entity and an out-of-state entity and there is some plus factor, such as the renewal of the contract that demonstrated "a continuing business relationship that lasted many years" or "telefaxes or calls with the plaintiff." *Diamond Crystal Brands*, 593 F.3d at 1269 & n.28 (cleaned up).

Defendants' primary argument is that they have no physical presence in

24

Florida. But the Supreme Court has long rejected that a party must send its agents into a state for that state to establish personal jurisdiction over the party. Most prominently, in *Burger King Corp. v. Rudzewicz* the Supreme Court confronted Florida's assertion of jurisdiction over an individual who "ha[d] never even visited there" and held that Florida could nonetheless exercise jurisdiction consistent with the Constitution. 471 U.S. at 479. *Burger King* is on point here. Although it appears that Defendants rarely send agents into Florida, their contracts with the SBA and other Florida-based companies have "a *substantial* connection with th[e] State." *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). The contracts create continuing obligations to provide these Florida-based entities with services for multiple years and to follow certain Florida laws pertaining to the hiring of illegal aliens and keeping of records. These contracts "create[] 'continuing obligations' between" Defendants "and residents of the forum" by requiring compliance and providing for automatic renewal. *Id.* at 476 (quoting *Travelers Health Ass'n. v. Virginia*, 339 U.S. 643, 648 (1950)).

Although the contracts to provide proxy advice are sufficient to satisfy the contacts requirement, Defendants' suit-related contacts with Florida do not stop there. As the declaration from Michael McCauley explains, both Glass Lewis and ISS are constantly sending communications into Florida through their Florida-based clients. Decl. of Michael McCauley ¶¶ 10, 13, 17, 18, 19, 21, 22; *Diamond Crystal*

25

*Brands*, 593 F.3d at 1269. These communications generally fall into two buckets. The first bucket is generic solicitations and marketing emails. ISS and Glass Lewis constantly send members of the Florida SBA governance team "marketing" and other business materials with the goal of preserving or expending their business. Decl. of Michael McCauley ¶¶ 10, 13, 17, 18, 19, 21, 22 ("The SBA regularly receives marketing emails from ISS."); *id.* ("The SBA regularly receives marketing emails from Glass Lewis."). These materials include copies of the Benchmark Policies discussed above. *Id.* ¶ 26. An attempt to solicit clients is a core example of conduct relating to this case, because the allegations in the complaint concern misleading representations. *SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997) ("It has also long been held that direct mailings of solicitation materials to the forum may provide a basis for personal jurisdiction."); *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1272 (11th Cir. 2022). The second is personalized communications with the SBA governance team about Glass Lewis's and ISS's products. *See Del Valle*, 56 F.4th at 1272, 1276–77. These communications include emails about the very DEI and ESG criteria that form the basis of this lawsuit. Decl. of Michael McCauley ¶ 27.

## 2. Defendants Purposefully Availed Themselves of Operating in Florida.

To satisfy this requirement, there must "'be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum

State, thus invoking the benefits and protections of its laws.'" *Burger King Corp.*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). That act can be entering into ongoing contracts in the forum, soliciting clients within the jurisdiction, agreeing to be bound by the laws of the jurisdiction, or seeking any other benefit from the forum. *Diamond Crystal Brands*, 593 F.3d at 1269; *SEC v. Carrillo*, 115 F.3d 1540, 1545–46 (11th Cir. 1997). The purposeful availment here is clear. Defendants entered into long-term contracts with Florida-based entities with the goal of receiving revenue from those entities.

The contracts at issue were not "random, isolated, or fortuitous." *Karnas v. Cuban*, No. 22-cv-22538, 2025 WL 3759241, at *10 (S.D. Fla. Dec. 30, 2025); *Burger King Corp.*, 471 U.S. at 475. As is plainly evidenced by the contracts between the SBA and Defendants, the contracts were carefully negotiated and contemplated a long-term ongoing relationship. Moreover they explicitly required Defendants to obey Florida laws regarding Defendants hiring practices *also* Ex. B at 3 ("Glass Lewis agrees to comply with[] Section 448.095, Florida Statutes"); Ex. F at 5 ("Provider," i.e., ISS, "agrees to comply with Section 448.095, Florida Statutes"). And in addition to contractually agreeing to comply with Florida law, Defendants have also each repeatedly sent marketing and other business materials into the state of Florida with the goal of maintaining or expanding their Florida client base. Decl. of Michael McCauley ¶¶ 17, 18, 21, 22, 26, 27. Such solicitations alone

27

constitute purposeful availment. *McGee*, 355 U.S. at 221–24.

Defendants argue that their contracts with Florida-based clients choose venues outside of Florida and contain choice-of-law clauses that apply law outside of Florida. ISS Br. at 13–14; Glass Lewis Br. at 17. But that does not negate the fact that Defendants have incorporated Florida law into their contracts and actively sought to do business with Florida entities. *See Breland v. Levada VF Five, LLC*, No. 14–158–CG–C, 2015 WL 225394, *2–5 (S.D. Sla. 2016) (exercising jurisdiction despite a clause stating that "[t]his agreement shall be governed by, and construed and interpreted in all respects in accordance with[] the laws of the State of Utah . . ."). Nor does the selection of non-Florida law negate the repeated solicitations they have sent into Florida.

Perhaps the most telling fact that Defendants have purposefully availed themselves of the benefits of transacting business in Florida is the characterization of their own actions. Defendants claim that the *Noerr-Pennington* doctrine immunizes them from liability because their recommendations to the Florida SBA constituted protected petitioning the government under the First Amendment. ISS Br. at 31. As explained below, they are plainly incorrect that the *Noerr-Pennington* doctrine bars either of the FDUTPA claims. The *Noerr-Pennington* doctrine does not apply when the government is merely a victim of a deceptive or unfair act. *Cf. Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503 (1988). But

28

more relevant here is that Defendants claim that they sought to "engag[e] in conduct . . . aimed at influencing decision[-]making by the government." ISS Br. at 31 (quoting *SmileDirectClub, LLC v. Battle*, 4 F.4th 1274, 1281 (11th Cir. 2021) (en banc)). "[T]he government" here is the Florida SBA. *Id.* If a party is seeking to influence a government agency, it would obviously be seeking to avail itself of that state's laws. Defendants cannot claim both to be engaged in a concerted effort to petition the Florida government while also maintaining that they have no connections with Florida.

### 3. Exercising Jurisdiction Would Comport with Traditional Notions of Fair Play and Substantial Justice.

Subjecting Defendants to personal jurisdiction in Florida would not offend traditional notions of fair play and substantial justice. Among other things, courts analyzing this prong consider: "(1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Del Valle*, 56 F.4th at 1277 (quotation omitted). Unlike the first two prongs of the constitutional personal-jurisdiction test, *Defendants* must make a "'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (quoting *Louis Vuitton*, 736 F.3d at 1355).

The burden on the Defendants litigating in Florida is minor. They are massive companies with the resources to litigate anywhere. Glass Lewis vaguely claims it

29

would be unfair for it to be forced to litigate in Florida because its employees are located elsewhere, but those kinds of arguments have been roundly rejected. *See Ranbaxy Lab'ys Inc. v. First Databank, Inc.*, No. 3:13-cv-859, 2014 WL 982742 (M.D. Fla. Mar. 12, 2014). Defendants are "large corporation[s], with customers across the country." *Id.* at *3. "[I]n light of modern modes of transportation and communication," there is little burden litigating in Florida. *Id.*

Florida's interest in litigating this case in Florida is substantial. It is well-established that states have a "significant interest" in protecting consumers from deceptive statements and practices. *Id.* Defendants argue that the failure of the SBA contract to specify Florida as the venue for a lawsuit or choice-of-law provision means that Florida lacks such an interest. ISS Br. at 13–14. They are wrong. Glass Lewis misunderstands what this case is about. Defendants did not just mislead the SBA, they misled all of their Florida-based consumers. Am. Compl. ¶¶ 14, 119. Simply because some consumers have agreed to have contract claims based on their relationships litigated elsewhere does not diminish Florida's interest in protecting Florida's markets.

Finally, concerns about judicial economy counsel having this case heard in Florida. Defendants themselves contend that they will need to take discovery of the Florida SBA, ECF No. 51 at 6, and much of the damages evidence will be located in Florida. As discussed above, modern communication technologies largely obviate

30

any concerns about judicial economy anyway. *Ranbaxy Lab'ys Inc.*, 2014 WL 982742 at \*2.

### III.    Plaintiff Has Stated a Claim for Violations of FDUTPA.

If this Court reaches Defendants' motions to dismiss under Rule 12(b)(6)—a decision that would exceed the bounds of its subject-matter jurisdiction—it should deny the motions. Glass Lewis and ISS have made representations and omissions that would deceive a reasonable consumer, and they have engaged in unfair practices by failing to sell disinterested advice.

Defendants nonetheless seek to have these fact-intensive claims dismissed at the pleading stage. But Defendants (1) improperly seek to resolve factual disputes, (2) misstate FDUTPA pleading standards, and (3) ignore well-pled allegations that ISS and Glass Lewis engaged in materially deceptive and unfair conduct directed at Florida consumers. At the motion-to-dismiss stage, the Court must accept Plaintiff's allegations as true and draw all reasonable inferences in Plaintiff's favor—not Defendants'.

### A.    Plaintiff Plausibly Alleges a Deceptive-Conduct Claim Under FDUTPA.

FDUTPA makes it unlawful for an entity to make a deceptive representation in the course of doing business. FLA. STAT. ANN. § 501.204(1) (West 2017). "[D]eception" under FDUTPA "occurs if there is a representation, omission, or practice that is likely to mislead [a] consumer acting reasonably in the

31

circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (internal quotations omitted). Plaintiff's complaint plausibly alleges precisely such deceptive conduct.

A reasonable consumer who views Defendants' claim that their putatively neutral policies seek to promote "long-term shareholder value," Am. Compl. ¶¶ 46, 69, would be deceived because Defendants employ many criteria that do not promote such values. For example, both Defendants recommended that their clients vote against members of corporate boards if those boards did not contain a sufficient number of female, nonbinary, or racial-minority directors. *Id.* ¶¶ 50, 63(a). As the amended complaint alleges, and this Court must accept as true, these DEI requirements "objectively *decrease* shareholder value by injecting considerations other than financial performance into the analysis." *Id.* ¶ 72. The environmental proposals that Defendants support also were antithetical to long-term shareholder value. Glass Lewis, for example, recommended "in favor of 100% of . . . climate lobbying . . . at US companies." *Id.* ¶ 79. Spending money to lobby the government concerning climate change does not increase long-term shareholder value at the relevant companies. Nor does both Defendants' insistence on setting goals for carbon emissions. *See id.* ¶¶ 72–76.

Other deceptive statements abound. For instance, it was deceptive for ISS to claim that it conducts "a rigorous analysis of ESG topics" when it had no analytical

32

support for the proposition that ESG concerns are material for every company. *Id.* ¶ 89. The same goes for Glass Lewis's statement that it conducts "in-depth research" when it voted overwhelmingly for value-destroying ESG and DEI proposals. As the complaint alleges, Defendants reflexively voted for pro-ESG and pro-DEI proposals without any analytical basis for concluding that such proposals increased shareholder value. *Id.* ¶ 95. Finally, the assurances that Glass Lewis's advice meets "regulatory requirements" and ISS's advice takes "into account relevant laws" are both misleading. *Id.* ¶ 109. Both Defendants recommend to their clients to vote for or against board members on the basis of race. But contracting on the basis of race is illegal under federal law. As the Eleventh Circuit has repeatedly held, 42 U.S.C. § 1981 "prohibits intentional race discrimination in the making and enforcement of public and private contracts." *Phillips v. Legacy Cabinets,* 87 F.4th 1313, 1320–21 (11th Cir. 2023); *Am. All. for Equal Opportunity v. Fearless Fund Mgmt., Inc.*, 103 F.4th 765, 776 (11th Cir. 2024). Selecting who to hire or retain as a member of a company's board plainly involves selecting who to "mak[e]" a contract with. *Phillips*, 87 F.4th at 1320–21; *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (explaining that Section 1981 "protects the would-be contractor along with those who already have made contracts"). Thus, Defendants are telling their clients to vote for policies that would violate federal law if implemented by the relevant companies. That is the opposite of ensuring regulatory compliance.

The amended complaint also sufficiently pleads deceptive omissions. Under FDUTPA, omissions are actionable where a defendant fails to disclose information necessary to prevent a statement from being misleading. *See Hetrick v. Ideal Image Dev. Corp.*, 372 F. App'x 985, 992 (11th Cir. 2010) (reversing dismissal of FDUTPA claims because that statute's "proscription against unfair and deceptive acts and practices sweeps far more broadly than the doctrine of fraud or negligent misrepresentation, which asks only whether a representation was technically accurate in all material respects."). Here, Plaintiff alleges that Defendants represented their recommendations as grounded in long-term shareholder value while omitting that such recommendations were driven by non-financial, ideological criteria, and omitting known legal risks tied to those recommendations. Am. Compl. ¶¶ 4, 50, 63(a), 123. For example, both Defendants recommended that their clients vote against board members unless those boards employed a certain number of female, non-binary, or racial-minority directors. *Id.* ¶¶ 50, 63(a), 123. Yet they failed to disclose that such recommendations are unrelated to maximizing shareholder value and that such recommendations could expose the companies to liability risks for violating anti-discrimination law. *Am. All. for Equal Opportunity*, 103 F.4th at 776. Those omissions render Defendants' affirmative statements misleading, and Plaintiff's allegations are sufficient at the pleading stage.

34

### 1.  Defendants' "Context" Arguments Fail.

Defendants argue that their statements about "long-term shareholder value," "rigorous" analytics, and "in-depth" research cannot be deceptive when read in context. ISS Br. at 23–24. That argument fails for three reasons: First, context is a factual question not resolvable on a motion to dismiss. Second, statements can be deceptive even if other information could possibly clarify the misleading nature of the statement. Third, Defendants' "context" argument improperly contradicts the complaint.

First, whether a statement is misleading in context is "ordinarily . . . a question of fact for the jury to determine" and thus not appropriate for resolution on a motion to dismiss. *S. Broward Hosp. Dist. v. ELAP Servs., LLC*, No. 20-CV-61007, 2020 WL 7074645, at *4 (S.D. Fla. Dec. 3, 2020); *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017) (same). In *Broward*, for example, a plaintiff sued over the adequacy of the disclosure of insurance-plan limitations on insurance cards issued by the defendant, and the defendant argued that the surrounding text resolved any deception. Because both sides offered competing arguments as to the adequacy of the disclosure, the court denied the motion to dismiss, noting "whether specific conduct constitutes an unfair or deceptive trade practice is a question of fact." *S. Broward Hosp. Dist.*, 2020 WL 7074645 *6. Similarly, in *Calderon v. Sixt Rent a*

35

*Car, LLC*, the parties disputed the adequacy of the disclosure of rental-agreement terms to customers where the terms contained in a lengthy "Rental Jacket" were incorporated by reference into a "Face Page" for customers to sign. No. 19-cv-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb 12, 2020). Even though the terms in the Rental Jacket were explicitly incorporated into the Face Page, the *Calderon* court concluded that "dismissal based on these allegations would be improper because 'whether specific conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine.'" *Id.* (cleaned up) (quoting *State Farm Mut. Auto. Ins. Co.*, 278 F. Supp. 3d at 1316).

Second, statements can be deceptive even if additional information that qualifies the statement exists elsewhere. *See Marty v. Anheuser-Busch Cos., LLC*, 43 F. Supp. 3d 1333, 1341 (S.D. Fla. 2014). Overall, the entirety of the information given to consumers by Defendants was plainly misleading. Even if, as ISS claims, the Benchmark Policy explained that it generally recommends that investors require specific racial and gender makeup on company boards, ISS Br. at 22, it did not disclose that those recommendations are inconsistent with long-term shareholder value. In other words, even if the methodology was disclosed, it was still misleadingly described as seeking to maximize "shareholder value." Am. Compl. ¶ 69.

Courts are remiss to resolve this kind of argument on a motion to dismiss. For

36

example, in *Marty v. Anheuser-Busch*, a consumer sued a beer producer alleging that the producer had packaged domestic beer in such a way that a reasonable consumer could be misled into believing the beer was imported. 43 F. Supp. 3d at 1340. The *Marty* court rejected the defendant beer producer's motion to dismiss the FDUTPA claim even when the defendant claimed a defense of disclosure because the beer's packaging had "Product of USA" and "BRAUEREI BECK & CO., BECK'S © BEER, ST. LOUIS, MO" printed on it. *Id.* at 1341. Here, too, it is inappropriate to resolve the merits of Defendants' defense that they adequately disclosed their methodologies on a motion to dismiss. *See Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*, 657 F. Supp. 2d 1279, 1290–91 (M.D. Fla. 2009) ("The argument that plaintiff should have reasonably foreseen the deception and mitigated damages is, at best, an affirmative defense which will not support a motion to dismiss.").

Third, Defendants' "context" argument improperly contradicts the complaint. Defendants rely heavily on documents the complaint references to argue that their disclosures are not deceptive. But at the pleading stage, those documents cannot be used to override plausible allegations where competing inferences exist. *See Brooks v. Blue Cross Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (documents incorporated into a complaint may be considered, but not to resolve factual disputes in favor of the non-movant). Defendants will have their day in court to argue that their statements were true in context, but that day is not today.

37

### 2.    Statements About "Shareholder Value" and "Rigorous Analysis" Are Not Puffery.

Defendants characterize their assertions as non-actionable aspirational statements or mere "puffery." Glass Lewis Br. at 25–26. They are correct that "subjective, unverifiable claims are 'mere puffery,'" *Marty*, 43 F. Supp. 3d at 1342 (quoting *Edmundson v. Procter & Gamble Co.,* 537 F. App'x. 708, 709 (9th Cir. 2013)), but they are wrong that their statements are "mere puffery."

Defendants' statements described above were not puffery because they can be proven or disproved. *Fineman v. Ferragamo USA Inc.*, 672 F. Supp. 3d 1302, 1311 (S.D. Fla. 2023). Whether Defendants' advice promoted "long-term shareholder value" is something that can be proven. Indeed, the Complaint cites studies disproving their claims. Am. Compl. ¶¶ 74–76. Defendants, of course, disagree, but that is a dispute to be litigated, not dismissed without further inquiry. Likewise, whether the analytics that ISS uses are "rigorous" can be proven or disproven. If, as the complaint alleges, ISS is not using analytics at all but instead is using political criteria to make recommendations, then its claim of using rigorous analytics in formulating its advice is deceptive. *Fineman*, 672 F. Supp. 3d at 1311. The same goes for Glass Lewis's contention that it utilizes "in-depth research" to make its recommendations. Am. Compl. ¶ 94.

Courts have found far more ambiguous statements contain sufficient factual content to survive a motion to dismiss. For example, a federal court in this circuit

38

concluded that a statement that a brand of beer was "German quality" did not constitute puffery under FDUTPA. *Marty*, 43 F. Supp. 3d at 1342; *see also Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 n.3 (9th Cir. 2008) (holding that a statement that snack was "nutritious" was not puffery where the "statement contruibute[d] . . . to the deceptive context").

Contrary to Defendants' arguments, even statements of opinion are actionable when they are misleadingly presented as objective fact. Opinion-like statements can be deceptive when they imply underlying factual support that does not exist. *See Vokes v. Arthur Murray, Inc.*, 212 So. 2d 906, 908 (Fla. Dist. Ct. App. 1968) (holding that "opinion" statements about a student's dance potential were actionable because they implied the existence of supporting facts known to the speaker). Plaintiff alleges Defendants represented their recommendations as grounded in "rigorous" and data-driven analysis, while, in reality, Defendants relied on undisclosed ideological criteria. Am. Compl. ¶ 95. Whether the Defendants' criteria were, in fact, "rigorous" and based on "shareholder value," rather than based on dubious ideological criteria is not a matter of mere opinion, and Plaintiff has adequately alleged facts supporting his allegations.

### 3. Plaintiff's Amended Complaint Meets the Applicable Pleading Standard.

ISS, but not Glass Lewis, contends that Plaintiff's deception claim sounds in fraud and fails to meet Rule 9(b)'s specificity requirements. Rule 9(b) requires a

plaintiff to plead the "who, what, when where, and how" of the alleged fraudulent conduct. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (quotation omitted). ISS's argument fails from the outset because Rule 9 does not apply to FDUTPA claims brought by the Attorney General. Rule 9 will only apply to a FDUTPA count if it "sounds in fraud." *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1294 (11th Cir. 2025). *Pop* specifically did "not decide" whether all FDUTPA claims sound in fraud. *Id.* at 1296 n.10.

A court determines if a count sounds in fraud "by comparing a plaintiff's allegations to the elements of common law fraud." *Id.* at 1294. Only if the elements "closely track the elements of common law fraud" will the FDUTPA count be subject to Rule 9. *Id.* "If not, then Rule 9(b) does not apply." *Id.*

A deceptive-practices FDUTPA count brought by the Attorney General does not "closely track the elements of common law fraud." *Id.* As Florida courts have explained, such claims by the Attorney General are "unlike fraud, [because the] party asserting a deceptive trade practices claim," the Attorney General, "need not show actual reliance on the representation or omission at issue." *Off. of Att'y Gen., Dept. of Legal Affairs v. Wyndham Int'l, Inc.,* 869 So. 2d 592, 598 (Fla. Dist. Ct. App. 2004). Unlike the plaintiff in *Pop* who specifically invoked "fraud" twice in his complaint, the Attorney General does not invoke "fraud" in his complaint and actually distinguishes this case from a fraud case on the grounds above. *See* Am.

40

Compl. ¶ 120 (discussing *Wyndham Int'l*, 869 So. 2d at 598).

Even if this Court disagrees, Plaintiff's amended complaint specifies each of the details required under 9(b). It identifies *who*: the Defendants, Am. Compl. ¶ 4; *what*: misrepresentations regarding the basis for their vote recommendations, including statements that their recommendations were based on "shareholder-value" and "analytical rigor" when in fact they were based on ideological criteria, *id.* ¶¶ 39, 77–81, 94; *when*: in their proxy-advice policies between 2020 and 2025, *see, e.g., id.* ¶¶ 47 n.24, 51 n.30, 58, 63(a) & n. 49; *where*: in their proxy-advice documents that they provided to clients in Florida, *id.* ¶¶ 39–65, 69–81; and *how*: by marketing their proxy advice services as objective, data-driven, shareholder-value drive, etc., *id.* ¶¶ 3, 9, 77–81, 94. These allegations satisfy Rule 9(b)'s requirements.

4. **Plaintiff Adequately Alleges Defendant Conduct in Florida.**

Defendants contend that the FDUTPA does not apply to them because the complaint fails to allege that any of Defendants' conduct took place within the territorial boundaries of Florida. ISS Br. at 18 n.5; Glass Lewis Br. at 23–25 Defendants' argument fails because it misstates the reach of FDUTPA as well as misreads Plaintiff's amended complaint.

Plaintiff adequately alleges that Defendants' conduct targeted Florida consumers, including specific Florida clients of ISS and Glass Lewis. Am. Compl. ¶¶ 14, 119. Even if Plaintiff had alleged that Defendants had only one contract with

a single Florida consumer—Plaintiffs has, in fact, identified multiple Florida-based clients of Defendants', *id.* ¶¶ 14, 119 —that would be enough to sustain a claim under FDUTPA. *See PNR, Inc.*, 842 So. 2d at 777 ("FDUTPA applies to private causes of action arising from single unfair or deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract."). Electronic communications sent into Florida are sufficient to establish jurisdiction under Florida's long-arm statute and are also sufficient to satisfy FDUTPA. *See Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-CIV, 2012 WL 1570057, at *5–6 (S.D. Fla. May 2, 2012) ("Given the FDUTPA's broad, plain language, whether the FDUTPA applies to Defendants requires an inquiry into the Court's personal jurisdiction over them."). Indeed, it would make no sense to read FDUTPA, which seeks to maintain the integrity of Florida markets and protect Florida consumers, to require the defendant to have a physical presence in Florida.

Defendants rely on *Millenium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*, 761 So. 2d 1256 (Fla. Dist. Ct. App. 2000), for the proposition that FDUTPA applies only to actions which took place wholly within Florida, but this reading misconstrues *Millenium* and courts interpreting that decision have rejected the same arguments Defendants raise here. *See Barnext Offshore, Ltd.*, 2012 WL 1570057, at *5 (rejecting argument that FDUTPA was inapplicable where "documents relevant

42

to the sale of [a] Yacht were signed in the Bahamas and [] the Yacht was physically transferred to [Plaintiff] in the Bahamas."). The *Barnext* court considered the *Millenium* case and stated that it "f[ound] nothing in *Millennium* suggests that the FDUTPA applies *only* when conduct occurs entirely within Florida. To the contrary, *Millennium* highlighted the broad statutory language used in the FDUTPA" and held that "whether the FDUTPA applies to Defendants requires an inquiry into the Court's personal jurisdiction over them." *Id.* at *6. Thus, the *Barnext* court held that "[t]he FDUTPA is to be applied broadly and is not limited" to conduct which "occurs entirely within Florida." *Id.*

### B. The Complaint Adequately Alleges Unfair Conduct Under FDUTPA.

Under FDUTPA, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc.*, 842 So. 2d at 777 (quotation omitted). Failing to provide advice that actually promotes long-term shareholder value meets this definition. It is substantially injurious to consumers because their investment portfolios are worth less than they would otherwise be. Am. Compl. ¶ 76.

In conducting the unfairness analysis, some Florida courts apply the federal three-part test adopted by the Federal Trade Commission: If "the act or practice" (1) "causes or is likely to cause substantial injury to consumers," (2) "which is not reasonably avoidable by consumers themselves," and (3) "not outweighed by

countervailing benefits to consumers or to competition," then the act is unfair and proscribed by FDUTPA. *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1098 (Fla. Dist. Ct. App. 2014).

The complaint adequately alleges unfair conduct under this test as well. First, Defendants' failure to provide disinterested advice to increase long-term shareholder value is "likely to cause substantial injury to consumers." *Id.* As alleged in the complaint, requiring corporate boards to have specific racial- and gender-demographic composition means that the most-qualified directors may be kept out because of their race or sex, harming long-term shareholder value. Am. Compl. ¶ 124. Similarly, requiring all companies, even those whose businesses are necessarily carbon-intensive, to set goals to reduce their carbon output harms those companies. *Id.* ¶¶ 72–76.

This harm is not reasonably avoidable by consumers. *Porsche Cars N. Am., Inc.*, 140 So. 3d at 1098. As explained in the complaint, Defendants are a duopoly. Am. Compl. ¶ 110. Investors, even large pension funds, do not have the resources to analyze every single shareholder vote. *Id.*. ¶ 31. Thus proxy advisors play a crucial role in facilitating shareholder votes, and there is no practical alternative for an institutional investor who wants to vote its shares. In this concentrated market, there is no way to avoid using Glass Lewis, ISS, or a mix of the two. *Id.*

Finally, there is no benefit here to consumers or competition. As explained

44

above, the market is a duopoly, resulting in limited competition. *Id.* ¶¶ 112–14. It would not harm the limited existing competition to force the Defendants to offer a product based on long-term shareholder value free from ideological bias.

### 1.  The *Noerr-Pennington* Doctrine Does Not Apply.

ISS, although not Glass Lewis, contends that the *Noerr-Pennington* doctrine immunizes it from liability. It is incorrect. As discussed at length in Plaintiff's reply brief in support of remand, ECF No. 53, the *Noerr-Pennington* doctrine is a statutory-interpretation tool that counsels reading vague or ambiguous statutes not to cover conduct that would be protected by the First Amendment. *SmileDirectClub, LLC*, 4 F.4th at 1281.

The *Noerr-Pennington* doctrine is not implicated because the complaint alleges that the SBA was a *victim* of Defendants' scheme, not a means through which Defendants victimized others. Am. Compl. ¶ 119. ISS can point to no case where the government being a victim of an unlawful practice triggered the *Noerr-Pennington* doctrine's protections. If ISS were correct, then the *Noerr-Pennington* doctrine would presumably allow defendants to subject the government to unfair practices at will. After all, every single attempt to persuade the government to purchase a product is an attempt "to influence government agencies." ISS Br. at 31; *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503 (1988) (explaining that the *Noerr-Pennington* doctrine does not allow a party to "exact . . . economic

45

advantages from the government"). What is more, the complaint alleges that Defendants harmed other non-governmental Florida entities in addition to the SBA. Am. Compl. ¶¶ 14, 119. Even if *Noerr-Pennington* somehow shielded Defendants from liability for their actions toward the SBA (and it does not), it cannot shield them for their actions towards non-governmental Florida entities.

## CONCLUSION

For the foregoing reasons, if this Court addresses Defendants' motions to dismiss rather than remanding to State court, it should deny Defendants' motions. And if the Court grants the motions, it should grant Plaintiff's separately filed motion for leave to amend the complaint.

Dated: May 8, 2026

/s/ *David H. Thompson*
David H. Thompson
Peter A. Patterson*
Harold S. Reeves*
Bradley L. Larson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
hreeves@cooperkirk.com
blarson@cooperkirk.com

*Admitted pro hac vice*

STATE OF FLORIDA
JAMES UTHMEIER
ATTORNEY GENERAL

Ryan Newman
Chief Deputy Attorney General

Lizabeth A. Brady (FLB #457991)
Director, Antitrust Division
Timothy Fraser (FLB #957321)
Special Counsel
Office of the Attorney General
State of Florida
Department of Legal Affairs
PL-01 The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300

46

*Counsel for Plaintiff*

## CERTIFICATE OF WORD COUNT

This memorandum contains 10,897 words, which is below the 11,000-word limit agreed by the parties in the unopposed motion to file an overlength memorandum.

Respectfully submitted,

/s/ *David H. Thompson*
David H. Thompson

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court and served on all counsel of record via the CM/ECF system on this 8th day of May, 2026.

Respectfully submitted,

/s/ *David H. Thompson*
David H. Thompson

47