# EXHIBIT E

## MASTER SERVICES AGREEMENT NO: MSA-GOV_00166824
### between
### Institutional Shareholder Services Inc. ("Provider")
### and
### State Board of Administration of Florida ("Subscriber" or "SBA")

Provider and Subscriber agree as follows:

**Purpose and Definitions:** The parties enter into this Master Services Agreement ("MSA") to establish the general terms and conditions to be incorporated by reference into any Addendum executed by the parties. Each Addendum will identify the products and/or services (collectively the "**Services**" to be provided by Provider and the fees due for such Services (the "**Fees**"). Where applicable, the Addendum will identify the quantity of Services to be provided, identified as the **Service Level**, and the **Overage Rate** due for Services rendered above the Service Level. Each Addendum, plus this MSA, shall be one separate and complete agreement ("**Agreement**"), independent of any other Addenda the parties may execute. In case of a conflict between the MSA and an Addendum, the provisions of the Addendum shall govern. Capitalized terms that are used but not defined in this MSA shall have the meanings given to them in the Addendum.

1   **Services.**
Provider shall deliver the Services for the Term (as set forth in each Addendum). Provider grants to the Subscriber a limited, non-exclusive, non-transferable license to use the information provided as part of, or connection with, the Services (the "**Information**") for internal business purposes only, subject to the Agreement. Provider may modify the Services in immaterial ways on reasonable notice to Subscriber so long as the Services continue to deliver the same material functions throughout the Term.

2   **Term and Renewal.**
The Agreement shall be in force for the Term, and thereafter shall automatically renew for successive one-year renewal terms unless either party notifies the other at least thirty (30) days before expiration that it will not renew. Notwithstanding any other provision of this Agreement, either party may terminate this Agreement for any reason upon 90 days written notice.

3   **Fees and Payment**
Provider shall invoice Subscriber for the amount of the Fees at the commencement of the Term, and payment shall be due within thirty (30) days of billing. Subscriber hereby consents to the electronic delivery of all invoices under the Agreement, which delivery may be made via email transmission to the email address set forth on the Addendum. For Services provided above the Service Level, Subscriber shall pay Provider additional Fees at the Overage Rate within thirty (30) days of billing for such additional Fees. Interest accrues on undisputed overdue amounts at the rate of one and one-half percent (1 ½%) per month or the maximum allowed by law, whichever is lower, beginning on the due date.

Provider may modify Fees due in a renewal Term by providing notice to Subscriber at least forty-five (45) days before the first day of the renewal Term. Notice of a modification of the Fees may be made via email transmission to the email address set forth on the Addendum (and/or such other email address that is regularly used by Provider to communicate with Subscriber). All Fees are exclusive of taxes. Subscriber shall pay any sales or similar taxes that may be imposed upon Fees although Subscriber shall have no liability for taxes imposed on Provider's income.

4   **Subscriber's Duty.**
Subscriber shall provide or ensure that Provider receives in a timely fashion all correct information necessary to provide the Services. Provider shall not be in breach of the Agreement if Subscriber fails to do so and as a result Provider is unable to provide the Services. Upon request, Provider shall provide Subscriber with written notice (including via email) of all required information and its due date. Subscriber (and its personnel) may be receiving access to the Services (or portions thereof) via one of

SBA Contract No. 0 1 6   6 2

Provider's electronic-delivery platforms.  Provider shall have no liability for any loss incurred by Subscriber as a result of (a) the misuse/violation of any access rights to, and use of, Provider's electronic delivery platforms by any of Subscriber's employees (including former employees) or other agents or (b) someone other than Subscriber (or its authorized employees/agents) using Subscriber's passwords or accounts.

5   **Proprietary Information; Limitations on Use.**
The Information is exclusively for Subscriber's internal use and is strictly confidential, except that Information related to voting proxies, as well as, research and reporting for specific accounts ("**Account Information**") may be disclosed and used to comply with applicable law and rules adopted by government agencies, and to manage Subscriber's accounts and report to each account's owners and advisors.  Subscriber shall not use the Information for any other purpose nor disclose the Information to other third parties.  Subscriber shall not copy, transfer, reproduce, or create derivative works from the Information for re-distribution to any third party except for disclosure of Account Information as permitted above.  All proprietary rights in the Information belong to Provider and its third-party licensors (if any).  The Information was prepared, selected, coordinated and arranged through the expenditure of substantial time, effort, judgment and money and constitutes valuable property of Provider and its licensors (as the case may be).

6   **Warranty.**
   a)   Provider represents and warrants that it either owns the entire right to, title to, interest in, or has the right to license, the Services and Information, and Subscriber's proper use of the same will not violate any intellectual property or proprietary rights of another.

   b)   Provider represents and warrants that all Services will be performed in a workmanlike manner by professionally trained and qualified staff.

   c)   EXCEPT AS WARRANTED ABOVE, THE SERVICES AND INFORMATION ARE " PROVIDED" AS IS WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED.  NEITHER PROVIDER NOR ITS LICENSORS (IF ANY) GUARANTEE OR WARRANT THE CORRECTNESS, COMPLETENESS, RELIABILTY, TIMELINESS, AVAILABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE SERVICES OR INFORMATION.

7   **Limitation of Liability.**
   a)   ISS' TOTAL LIABILITY FOR ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THE AGREEMENT OR THE PROVISION OF ANY SERVICES, WHETHER IN CONTRACT, TORT, WARRANTY, INDEMNITY OR OTHERWISE, SHALL BE LIMITED TO THE FEES PAID BY SUBSCRIBER IN ANY ONE YEAR TERM OF THE AGREEMENT FOR ANY AND ALL CLAIMS MADE WITHIN THAT YEAR, WHETHER ARISING OUT OF OR RELATED TO EVENTS OCCURRING DURING THAT YEAR OR EARLIER.

   b)   NEITHER PARTY, NOR  PROVIDER'S LICENSORS (IF ANY), SHALL BE LIABLE FOR ANY  INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT OR THE PROVISION OF ANY SERVICES, WHETHER IN CONTRACT, TORT, WARRANTY OR OTHERWISE.  THIS LIMITATION WILL APPLY EVEN IF A PARTY HAS BEEN ADVISED OF, OR IS AWARE OF, THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING THE FOREGOING, LOST PROFITS SHALL BE DUE TO PROVIDER IN THE EVENT OF SUBSCRIBER'S WRONGFUL RE-DISTRIBUTION OF THE INFORMATION TO UNAUTHORIZED THIRD PARTIES.

c) Nothing in this Agreement shall in any way constitute a waiver or limitation of Subscriber's rights under federal or state securities laws or, if applicable, ERISA, which may impose liability on persons who act in good faith.

d) Each provision of the Agreement excluding or limiting liability operates separately. If any part is held by a court to be unreasonable or inapplicable, the other parts will continue to apply.

## 8 Indemnification.

Subscriber shall indemnify Provider and hold it harmless from all claims and damages, including without limitation reasonable attorneys' fees, arising out of Subscriber's breach of its covenants and agreements in the Agreement. Provider shall indemnify Subscriber and hold it harmless from all third-party claims and damages relating thereto, including without limitation reasonable attorneys' fees, that the Services infringe that party's copyright, trademark or other intellectual property rights. An indemnified party must give the other party prompt notice of any claim and allow the indemnifying party to defend or settle the claim as a condition to indemnification. No settlement shall bind a party without its written consent.

## 9 Termination.

a) One party may terminate the Agreement on notice to the other upon the other party's failure to cure a material breach within thirty (30) days after notice of a demand to cure the breach. For avoidance of doubt and without limitation, Subscriber's failure to pay Fees within sixty (60) days of their due date is deemed a material breach. Failure by Subscriber to pay any Fee by the due date shall entitle Provider, without prejudice to its other rights and remedies under this Agreement, at law or otherwise, to terminate the Services and/or the Agreement after having given the notice and cure period set forth above. Subscriber shall pay all costs of collection (including collection agency and attorneys' fees) reasonably incurred in collecting overdue Fees. If Provider terminates the Agreement for Subscriber's breach, Subscriber shall owe Provider the amount of unpaid Fees through the end of the Term. If Subscriber terminates the Agreement for Provider's breach, Provider shall refund to Subscriber any Fees pre-paid for the period following termination.

b) If Provider ceases or plans to cease to offer all or any part of the Services to all subscribers for any reason, Provider may terminate the Agreement as to all or a portion of the Services by providing Subscriber at least sixty (60) days advance notice. Provider shall promptly refund the portion of Fees paid for the discontinued Services for the period following termination.

c) Upon termination, all obligations of Provider to provide Services and all rights of Subscriber to receive Services shall immediately cease. Promptly upon termination, Subscriber shall (i) cease use of the Services; (ii) return or, at Provider's option, destroy all printed or electronic copies of the Information, except for Account Information if required by law to be retained for compliance purposes; and (iii) pay Provider all amounts due (e.g. unpaid Fees, accrued interest on overdue Fees, and any other costs imposed herein). Information retained for compliance purposes may not be used for any other purpose, nor used in any way not permitted by the Agreement. See (a) and (b) above for Provider's duties on termination. No specific remedy shall be exclusive of any other remedy.

## 10 Confidentiality.

"**Confidential Information**" means all non-public information provided to Provider by Subscriber hereunder if Provider receives notice that the information is confidential. Provider shall use commercially reasonable measures to protect the confidentiality of all Confidential Information acquired from Subscriber under the Agreement, and shall not disclose any such information to any third party except as required in the performance of the Services and/or unless required to do so by law, regulation, court order or similar process, or unless Subscriber's information has become public through no breach of confidentiality by Provider. Provider will comply with applicable privacy laws and regulations applicable to it.

**11  Governing Law, Jurisdiction and Attorneys' Fees.**
The Agreement shall be governed exclusively by the laws of the State of New York, not including its laws on conflicts of law.  Subscriber irrevocably consents to the exclusive jurisdiction of the courts in and for New York for the adjudication of all disputes hereunder, and consents to personal jurisdiction in such courts.  The prevailing party in any litigation shall be entitled to recover expenses, including reasonable attorneys' fees and court costs.

**12  Severability.**
If any provision of the Agreement is found to be invalid or unenforceable, such provision shall continue to apply subject to the minimum reductions or modifications necessary to make it valid and enforceable.  All other provisions shall remain in full force and effect.  No provision shall be deemed dependent upon any other provision unless so stated herein.

**13  Miscellaneous**
   a) All notices shall be in writing and delivered in either hard copy or electronic format (including email) to the party's address and contact person stated below or on the Addendum, or another address provided by proper notice.    Notice shall be effective as of actual delivery.
   b) Facsimiles and photocopied signatures will be treated as originals.
   c) The relationship of the parties is that of independent contractors.  Subscriber appoints Provider its agent solely for the purpose of delivering the Services, that is, to receive proxy proposals and vote proxies on behalf of Subscriber where that service is included in the Services.   Notwithstanding anything to the contrary, neither the Services nor any work performed by Provider pursuant to the Agreement shall be deemed "work for hire".
   d) No party shall be liable for any delay or interruption of performance due to circumstances beyond its reasonable control.
   e) No waiver or modification of the Agreement shall be binding without the written consent of the parties. Failure or delay by either party to exercise any right or insist upon strict compliance with any provision hereof shall not be deemed a waiver of rights in that or any other instance.  A waiver of one default shall not waive any other default.
   f) Sections (3) and (5) – (15) shall survive termination of the Agreement.
   g) Neither party may assign rights or delegate duties under the Agreement without the prior written consent of the other party.
   h) No action, regardless of form, arising out of or relating to this Agreement may be brought by either party more than one year after the cause of action arose, or in the case of non-payment, more than two years from the date of last payment.
   i) No third party is a beneficiary or has any rights under the Agreement, or is entitled or has standing to bring any action, suit or proceeding to enforce any part hereof, unless otherwise agreed by the parties in writing.
   j) Securities Class Action Services, LLC ("SCAS"), a wholly-owned subsidiary of Provider, provides class action lawsuit data and services.  To the extent that Subscriber is acquiring the Securities Class "Action Service Service", it is specifically acknowledged and agreed that SCAS and not Provider is the provider of such Service.
   k) Attached hereto as Exhibit A are certain supplemental terms for specific materials which are available as part of certain Provider products and services.  To the extent that Subscriber has access to the materials referenced on Exhibit A, then the terms on Exhibit A are incorporated herein and made a part hereof.
   l) The parties acknowledge that in the event of any breach of Provider's intellectual property rights under the Agreement, Provider may not have an adequate remedy at law.  Consequently, the parties agree that in such event Provider shall be entitled to seek the remedies of temporary and permanent injunction, specific performance or any other form of equitable relief without the necessity of proving actual damages.  This provision shall not, however, be construed as a waiver

of any rights or defenses that Provider may have for damages, or any other remedies to which Provider may be entitled.

m)

(i) During the term of and for a period of six (6) years after the expiration or termination of this Agreement, the SBA shall have the right to have any person or entity designated by the SBA, including an independent public accountant or auditor and/or any federal or state auditor, to inspect, review and/or audit, solely those books and records relating to the SBA's files and this Agreement (the "Records"). In the event such right is exercised and upon no less than ten (10) business days' prior written notice from the SBA, the Provider agrees to permit reasonable access to its premises and the Records during Provider's normal business hours. The SBA shall have the right, in connection with any such inspection, review and/or audit, to have one or more members of its staff present at all times. During the term of and for a period of six (6) years after the expiration or termination of this Agreement (or such longer period of time that may be required by any applicable law relating to the retention of the Records), the Provider shall maintain and retain the Records, at its sole expense. In the event the SBA and/or its designees are in the process of conducting such an inspection, review and/or audit upon expiration of the one (1) year period access and retention periods described herein, then this Section 13. (m) shall survive in its entirety until the conclusion of such inspection, review and/or audit, in the SBA's or the SBA's designee's reasonable determination. For the avoidance of doubt, the scope of any inspection, review and/or audit under this Section 13. (m) may include, without limitation, the Provider's compliance with the terms of this Agreement and compliance with any applicable foreign, federal, state and/or local law or regulation.

(ii) The Provider shall use reasonable efforts to cooperate with the SBA and any person or entity designated by the SBA in connection with any inspection, review and/or audit under this Section 13. (m) including, without limitation, causing its relevant and knowledgeable employees and/or representative to be available to assist and to respond to reasonable inquiries and requests of the SBA and/or its designees under this Section. The Provider shall respond (including, if relevant and appropriate, with an action plan) within a reasonable time to any reports, finding and/or assessments provided to the Provider by the SBA and/or its designees, and the Provider shall provide a copy of all such responses to the SBA. The Provider acknowledges and agrees that any such report, finding and/or assessment are intended for the sole use and for the benefit of the SBA.

(iii) Except as set forth herein, the SBA shall bear the costs of any inspection, review and/or audit described in this Section 13 (m). However, in the event, the SBA and/or its designees conclude that the Provider overcharged the SBA in an amount that exceeds the total compensation and expenses payable to the Provider under the Agreement by five percent (5%) or that the Provider engaged in or committed (including through acts or omissions) any fraud, misrepresentation and/or non-performance, then the Provider shall be obligated to reimburse the SBA for the total reasonable costs of inspection, review and/or audit within ninety (90) days of the SBA's request for reimbursement thereof.

## 14  Disclosures.

a) <u>Regulatory Disclosures.</u> From time to time, applicable laws and rules may require Provider to disclose information to or otherwise communicate with Subscriber. Subscriber hereby agrees that Provider may deliver any such information or other communication electronically. In this regard, Subscriber acknowledges that Subscriber has had the opportunity and will continue to have the opportunity to access Provider's disclosure brochure required by Rule 204-3 under the Investment Advisers Act of 1940 through Provider's Website at: http://www.issgovernance.com/practices or such other site as Provider may identify from time to time. Provider may send other required communications to Subscriber by e-mail as provided in

Section 13(a) above.  Subscriber may revoke this general consent to electronic delivery at any time, or may request a hard copy of any particular document covered by this consent.

b) **Disclosure Regarding Issuer Relationships.** *ISS Corporate Services, Inc. ("ICS"), also a wholly-owned subsidiary of ISS-US, offers products and services (described on ICS' Website) to issuers of proxy solicitations consisting primarily of advisory and analytical services, self-assessment tools and publications.  ICS employees are not involved in ISS' analysis of filed proxy proposals or preparation of vote recommendations.*

c)
To the extent applicable, the Provider shall comply with Chapter 119, Florida Statutes.  In particular, to the extent required under Chapter 119, Florida Statutes, the Provider shall:

(i) Keep and maintain public records required by the SBA in order to perform the services under this Agreement;

(ii) Upon  request from the SBA's custodian of public records, provide the SBA with a copy of the requested public records or allow the public records to be inspected or copied within a reasonable time  at a cost that does not exceed the cost provided in Chapter 119, Florida Statutes or as otherwise provided by Florida law;

(iii) Ensure that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law for the duration of the term of the Agreement and following completion of the Agreement if the Provider does not transfer the records to the SBA; and

(iv)  Upon completion of the Agreement, transfer, at no cost, to the SBA all public records in the Provider's possession or keep and maintain public records that ordinarily and necessarily would be required by the SBA to perform the services under this Agreement.  If the Provider transfers all public records to the SBA upon completion of the Agreement, the Provider shall destroy any duplicate public records that are exempt or confidential and exempt from public records disclosure requirements.  If the Provider keeps and maintains public records upon completion of the Agreement, the Provider shall meet all applicable requirements for retaining public records. The Provider shall use commercially reasonable efforts to provide all public records that are stored electronically to the SBA, upon request from the SBA's custodian of public records and at SBA's expense, in a format that is compatible with the information technology systems of the SBA.

(v)   IF THE PROVIDER HAS QUESTIONS REGARDING THE APPLICATION OF CHAPTER 119, FLORIDA STATUTES, TO THE PROVIDER's DUTY TO PROVIDE PUBLIC RECORDS RELATING TO THIS AGREEMENT, CONTACT THE CUSTODIAN OF THE PUBLIC RECORDS AT:
STATE BOARD OF ADMINISTRATION OF FLORIDA
POST OFFICE BOX 13300
TALLAHASSEE, FLORIDA  32317-3300 .
(850) 488-4406
SBAContracts_DL@sbafla.com

## 15  Entire Agreement.
The Agreement constitutes the entire agreement of the parties with respect to its subject matter, and supersedes all prior oral and written agreements, proposals and discussions.  All terms of any Subscriber purchase order or other document are rejected unless signed by Provider.

**ACCEPTED**:

| State Board of Administration of Florida | Institutional Shareholder Services Inc. |
|---|---|
| Signature | Signature _Allen Heery_<br>Allen Heery (Jul 1, 2016) |
| Printed Name:  Ashbel C. Williams | Name: **Allen Heery** |
| Title Executive Director & CIO | Title:  CFO |
| Date:  6/30/16 | Date:  Jul 1, 2016 |
| Address:<br>1801 Hermitage Blvd Suite 100<br>Tallahassee, FL  32308<br><br>Invoices may be delivered by email to<br>AccountsPayable@sbafla.com or mailed to<br><br>State Board of Administration of Florida<br>**Attention: Accounts Payable**<br>B.O. Box 13300<br>Tallahassee, FL 32317-3300 | Address:<br>702 King Farm Boulevard, Suite 400<br>Rockville , MD 20850-4045 |

APPROVED AS TO LEGALITY:

CRAIG A. MEYER
ASSISTANT GENERAL COUNSEL

Exhibit A

**Supplement Terms**

STANDARD & POOR'S CUSIP SERVICE BUREAU

Subscriber agrees and acknowledges that the CUSIP Database and the information contained therein is and shall remain valuable intellectual property owned by, or licensed to, Standard & Poor's CUSIP Service Bureau ("CSB") and the American Bankers Association ("ABA"), and that no proprietary rights are being transferred to Subscriber in such materials or in any of the information contained therein. Any use by Subscriber outside of the clearing and settlement of transactions requires a license from CSB, along with an associated fee based on usage. Subscriber agrees that misappropriation or misuse of such materials will cause serious damage to CSB and ABA, and that in such event money damages may not constitute sufficient compensation to CSB and ABA; consequently, Subscriber agrees that in the event of any misappropriation or misuse, CSB and ABA shall have the right to obtain injunctive relief in addition to any other legal or financial remedies to which CSB and ABA may be entitled.

Subscriber agrees that Subscriber shall not publish or distribute in any medium the CUSIP Database or any information contained therein or summaries or subsets thereof to any person or entity except in connection with the normal clearing and settlement of security transactions. Subscriber further agrees that the use of CUSIP numbers and descriptions is not intended to create or maintain, and does not serve the purpose of the creation or maintenance of, a master file or database of CUSIP descriptions or numbers for itself or any third party recipient of such service and is not intended to create and does not serve in any way as a substitute for the CUSIP MASTER TAPE, PRINT, DB, INTERNET, ELECTRONIC, CD-ROM Services and/or any other future services developed by the CSB.

NEITHER CSB, ABA NOR ANY OF THEIR AFFILIATES MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY OF THE INFORMATION CONTAINED IN THE CUSIP DATABASE. ALL SUCH MATERIALS ARE PROVIDED TO SUBSCRIBER ON AN "AS IS" BASIS, WITHOUT ANY WARRANTIES AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE NOR WITH RESPECT TO THE RESULTS WHICH MAY BE OBTAINED FROM THE USE OF SUCH MATERIALS. NEITHER CSB, ABA NOR THEIR AFFILIATES SHALL HAVE ANY RESPONSIBILITY OR LIABILITY FOR ANY ERRORS OR OMISSIONS NOR SHALL THEY BE LIABLE FOR ANY DAMAGES, WHETHER DIRECT OR INDIRECT, SPECIAL OR CONSEQUENTIAL, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL THE LIABILITY OF CSB, ABA OR ANY OF THEIR AFFILIATES PURSUANT TO ANY CAUSE OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE, EXCEED THE FEE PAID BY SUBSCRIBER FOR ACCESS TO SUCH MATERIALS IN THE MONTH IN WHICH SUCH CAUSE OF ACTION IS ALLEGED TO HAVE ARISEN. FURTHERMORE, CSB AND ABA SHALL HAVE NO RESPONSIBILITY OR LIABILITY FOR DELAYS OR FAILURES DUE TO CIRCUMSTANCES BEYOND THEIR CONTROL.

Subscriber agrees that the foregoing terms and conditions shall survive any termination of its right of access to the materials identified above.

**Exhibit B**

1. Notwithstanding any provision in this Agreement between the parties, ISS acknowledges and agrees that the State Board of Administration of Florida, as an Entity of the State of Florida, is prohibited from entering into indemnification agreements. See Florida Attorney General Opinion 99-56, dated September 17, 1999.

2. Notwithstanding any provision in this agreement between the parties, ISS acknowledges and agrees that the State Board of Administration of Florida, as an Entity of the State of Florida, is prohibited from entering into a limitation of remedies agreement. See Florida Attorney General Opinion 85-66, dated August 23, 1985.

3. Notwithstanding any provision to contrary, this Agreement shall not be construed as a waiver of the sovereign immunity of the State of Florida or a waiver of the State of Florida's rights under the 11th Amendment to the United States Constitution.

**Institutional Shareholder Services Inc.**

**ADDENDUM NO. (Schedule-GOV_00166825 - 05/10/2016)**
**Incorporating Master Service Agreement (MSA) No. (MSA-GOV_00166824) between Subscriber**
**&**
**Institutional Shareholder Services Inc.**

Between Subscriber and Provider

**Subscriber:**            State Board of Administration of Florida

**Term and Annual Fee**        07/01/2016 - 06/30/2017        $194,962.00
                               07/01/2017 - 06/30/2018        $200,810.86
                               07/01/2018 - 06/30/2019        $206,835.19
                               07/01/2019 - 06/30/2020        $213,040.24
                               07/01/2020 - 06/30/2021        $219,431.45

**Payment Schedule:**    Quarterly to be paid In Advance by Subscriber. *

*Subscriber may elect to have invoices sent to a third party (see contact info for billing inquiries). If third party declines to pay for service, then Subscriber will be liable for entire payment.

**Service(s):**            **As noted on the Services Schedule attached hereto.**

**Notwithstanding anything to the contrary in the MSA, the provisions set forth in Attachment 1 are hereby incorporated and shall apply to this Agreement.**

**Subscriber Information:**

Information sent to:

| Name: Mike McCauley | |
|---|---|
| Title:  Senior Corporate Governance Officer | |
| Street Address:  1801 Hermitage Boulevard | |
| City, State, Zip:  Tallahassee, FL 32308 | |
| Tel:  (850) 413-1252 | Fax:  (850) 413-1255 |
| E-mail:  mike.mccauley@sbafla.com | |

**Invoicing Information:**

| State Board of Administration of Florida |
|---|
| **Attention: Accounts Payable** |
| P.O. Box 13300 |
| Tallahassee, FL 32317-3300 |
| **AccountsPayable@sbafla.com** |

**ACCEPTED:**

| State Board of Administration of Florida | Institutional Shareholder Services Inc. |

| Signature: | Signature: *Allen Heery* <br> Allen Heery (Jul 1, 2016) |
|---|---|
| Name: <br> Ashbel C. Williams | Name: Allen Heery |
| Title: <br> Executive Director & CIO | Title: CFO |
| Date: <br> June 30, 2016 | Date: Jul 1, 2016 |
| Address: <br> 1081 Hermitage Blvd. Suite 100 <br> Tallahassee, FL, 32308 | Address: <br> 702 King Farm Boulevard, Suite 400 <br> Rockville , MD 20850-4045 |

APPROVED AS TO LEGALITY:

CRAIG A. MEYER
ASSISTANT GENERAL COUNSEL

## Services Schedule

Where the Services include Services Levels, the Annual Fee covers the Service Levels listed below and any usage in excess of the Service Levels will be charged at the Overage Rate.

## DESCRIPTION OF SERVICE ELEMENTS

### Product Category: Proxy Research

Proxy Voting Services include:
- Access to the ISS ProxyExchange web-based voting and research platform to access vote recommendations and research reports.
- ISS' Proxy Voting Guidelines (standard market-based and Benchmark Guidelines);
- Access to Governance Exchange (ISS' online forum for Institutional Investors, Directors, and Corporations).
- A dedicated Account Manager to service Subscriber's account and be familiar with Subscriber's proxy environment, preferences and needs.

Subscriber will also receive general periodicals (as and if produced), invitations to general informational webcasts and Subscriber may also receive an invitation to regional client events, as appropriate.

### Product Category: M&A Edge

M&A Edge Notes, Research Reports and Pipeline research on high profile and contentious M&A deals and proxy fights (as chosen by the heads of ISS M&A Research group).
- Service includes dedicated Account Manager
- On-line and/or email delivery of research.
- Reasonable access to M&A Research team for discussions on M&A Edge research and live situations; may include periodic in-person meetings.

## INCLUDED SERVICE LEVELS

Benchmark Research (US)
Category: Institutional Governance
Report Limit: 2,800
Per Report Overage: $12.00

Benchmark Research (Global)
Category: Institutional Governance
Report Limit: 5,606
Per Report Overage: $27.00

Special Situations Research
Category: Institutional Governance

**Attachment 1**

**Additional Terms and Conditions**

**The special provisions below shall apply to this Agreement, notwithstanding the provisions of the MSA.**

1.  If a Business Group is defined on the first page of the Addendum, then the Services shall only be used by that specific Business Group of Subscriber and the distribution of the Services (including the Information contained within the Services) outside of the designated Business Group is not permitted.

2.  If a Location is defined on the first page of the Addendum, then the Services may only be used by Subscriber at the specified Location and the distribution of the Services (including the Information contained within the Services) outside of the designated Location is not permitted.

3.  Regulatory Disclosures - From time to time, applicable laws and rules may require Provider to disclose information to, or otherwise communicate with, Subscriber. Subscriber hereby agrees that Provider may deliver any such information or other communication electronically (including but not limited to via email). In this regard, Subscriber acknowledges that Subscriber has had the opportunity and will continue to have the opportunity to access Provider's disclosure brochure required by Rule 204-3 under the Investment Advisers Act of 1940 through Provider's website. Provider may send other required communications to Subscriber by email as provided in the MSA or in this Addendum. Subscriber may revoke this general consent to electronic delivery at any time, or Subscriber may request a hard copy of any particular document covered by this consent.

4.  Where the Service Schedule specifies the number of User IDs for certain Services, each User ID shall only be used by one individual. The sharing of User IDs is not permitted.

5.  If Subscriber is an academic institution that has subscribed to the Governance Data Service and/or the STATS Service (the "Subscribed Data Services"), the following provision shall apply:

6.  "Subscriber shall have the right to use the Subscribed Data Services (and the Information contained in the Subscribed Data Services) for the purpose of non-commercial, non-profit research for any academic research project conducted on Subscriber's premises. Subscriber's subscription to the Subscribed Data Services only includes up to one hour of support services from Provider. Subscriber may incorporate limited, non-substantial portions of the data contained in the Subscribed Data Services in non-commercial, non-profit academic works or publications; provided that: (i) Subscriber promptly provides Provider with a copy of such academic work or publication; and (ii) attribution to "Institutional Shareholder Services Inc." as the source of such data is included in such academic work and/or publication.

7.  For the avoidance of doubt, under no circumstances may Subscriber incorporate the entirety of the data and or Information and/or a substantial portion of the data and/or Information in any work or publication. The commercial use of the Subscribed Data Services (including without limitation, the data and/or Information contained in the Subscribed Data Services) is not permitted hereunder and shall require a separate agreement with Provider. "